[No. S113295. Aug. 29, 2005.]

POWERINE OIL COMPANY, INC., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent,
CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA et al., Real
Parties in Interest.

## COUNSEL

Heller, Ehrman, White & McAuliffe, David B. Goodwin, Esta L. Brand; Isola Bowers, David R. Isola and Aaron R. Bowers for Petitioner.

Weston, Benshoof, Rochefort, Rubalcava & MacCuish and Richard Giller for United Policyholders as Amicus Curiae on behalf of Petitioner.

Morgan, Lewis & Bockius, Michel Y. Horton, David S. Cox and Andrea C. Okura for ITT Industries, Inc., as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

O'Melveny & Myers, Richard B. Goetz, Martin S. Checov, Carlos E. Needham, Eric Y. Kizirian; Berman & Aiwasian and Ray Tamaddon for Real Party in Interest Central National Insurance Company of Omaha.

Hancock Rothert & Bunshoft, William J. Baron, Kathryn C. Ashton and Patrick A. Cathcart for London Market Insurers as Amicus Curiae on behalf of Real Party in Interest Central National Insurance Company of Omaha.

Wiley, Rein & Fielding, Laura A. Foggan, John C. Yang, Paul J. Haase; Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott and John J. Moura for Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Real Party in Interest Central National Insurance Company of Omaha.

No appearance for Real Parties in Interest Century Indemnity Company, ACE Property and Casualty Company and Pacific Employers Insurance Company.

## OPINION

### BAXTER, J.—

#### INTRODUCTION

Powerine Oil Company (Powerine), a now defunct oil refinery, faces liability for certain governmentally imposed cleanup and abatement orders requiring it to remediate soil and groundwater pollution resulting from its past refinery operations at various locations. In *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945 [103 Cal.Rptr.2d 672, 16 P.3d 94] (*Powerine I*), an earlier writ proceeding in the instant case, we held that the insurer's duty to indemnify Powerine, the insured, for " 'all sums that the insured becomes legally obligated to pay as damages' " under the wording of the standard comprehensive general liability (CGL) insurance policy is limited to "money ordered by a court," and does not extend to environmental cleanup costs ordered by an administrative agency pursuant to an environmental statute. (*Id.* at p. 960.) This conclusion flowed logically both from the literal language of the standard CGL policy, which provides coverage for court-ordered "damages," and from our earlier decision in *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*), which held that the insurer's duty to defend the insured in a suit "seeking damages" under the wording of the same standard CGL policy is likewise limited to civil suits prosecuted in court. (*Id.* at pp. 878–888.)

In this matter, following on the heels of the earlier writ proceeding, we are called upon to decide whether the obligation of another insurer to indemnify Powerine under the wording of nine *excess/umbrella* insurance policies is likewise limited to money ordered by a court in a suit for damages against the insured. The Court of Appeal concluded it is not, reasoning that the insuring

language of the excess/umbrella policies here in question is broader than that of the standard primary CGL policy at issue in *Powerine I*, and covers costs that the insured must expend in complying with an administrative agency's pollution cleanup and abatement orders. For reasons to be explained, we agree. Although other policy provisions or exclusion clauses yet to be litigated could ultimately defeat coverage as this litigation progresses, the express wording of the central insuring agreement in these nine excess/umbrella policies goes well beyond mere coverage for court-ordered money "damages," and is broad enough to include coverage for the liability of environmental cleanup and response costs ordered by an administrative agency. Under a literal reading of these policies, we conclude such would be the objectively reasonable expectation of the insured. Accordingly, we shall affirm the judgment of the Court of Appeal directing the trial court to deny the insurer's motion for summary adjudication of the duty to indemnify.

FACTS AND PROCEDURAL BACKGROUND

The parties have stipulated to the underlying facts. The issue before the lower courts and now this court is one of law, and involves the interpretation of the insuring provisions of nine standard form excess/umbrella policies issued by real party in interest Central National Insurance Company of Omaha (Central National) to Powerine over the course of 10 years.

Powerine, through its various owners, was periodically engaged in oil refinery operations in Southern California since the mid-1930's. These included oil refining, oil- and petroleum-related exploration, production, terminaling and transportation operations throughout the western states. At one point Powerine's business occupied over 100 acres at its Santa Fe Springs refinery. In 1985, however, a soft petroleum market forced Powerine into bankruptcy. Since that time, the refinery has not been operated at all and only a skeleton crew of employees has remained for environmental compliance and equipment maintenance purposes.

As a result of its operations, Powerine faces governmentally imposed environmental liabilities arising from alleged soil and groundwater contamination at various locations. The California Regional Water Quality Control Boards for the Los Angeles and San Diego regions (Regional Water Boards) initiated remedial administrative proceedings against Powerine pursuant to an environmental statute, the Porter-Cologne Act. (Wat. Code, § 13000 et seq.) Two cleanup and abatement orders were issued to Powerine requiring it to remediate pollution resulting from its past oil refinery operations at 10 locations. It is undisputed that these orders were not issued as a result of litigation or as part of an injunction. Cleanup and abatement order No. 97-118, issued by the Los Angeles Regional Water Board, allegedly followed

negotiations and a series of compromises between Powerine and that Regional Water Board concerning the scope of the order and the nature and extent of investigative activities to be undertaken thereunder. As of the date of the proceedings in the Court of Appeal, Powerine had not incurred any expenses pursuant to either order.

Powerine notified its many insurers of the orders, giving rise to a declaratory relief action against it. (*Highlands Insurance Company v. Powerine, etc., et al.* (Super. Ct. L.A. County, 2002, No. VC025771).) Powerine cross-complained against numerous insurers, including certain London underwriters which had issued both primary CGL and excess/umbrella policies, and real party in interest Central National, which had issued nine excess/umbrella policies covering periods from 1973 to the expiration of the last policy in February 1983.[1] The cross-complaint alleged that each insurer had a contractual duty to defend and indemnify Powerine for the costs of cleanup and abatement arising from the environmental orders issued by the Regional Water Boards, and sought, inter alia, declaratory relief and damages for breach of contract and of the covenant of good faith and fair dealing.

While the declaratory relief action and cross-complaint were pending, this court decided *Foster-Gardner, supra,* 18 Cal.4th 857, holding that under the standard CGL policy defense-clause language, no duty to defend arises in connection with prelitigation administrative proceedings as it does when a suit "seeking damages" is commenced through the filing of a complaint in court. (*Id.* at pp. 878–888.) Consequently, the primary insurers in this action (Certain Underwriters at Lloyds of London, hereafter the London Market Insurers) moved for summary adjudication of their duty to defend and duty to indemnify costs resulting from the Regional Water Boards' administrative proceedings and issuance of cleanup and abatement orders under the Porter-Cologne Act.[2] When the trial court denied the motion, the primary insurers petitioned for a writ of mandate in the Court of Appeal. That court

---

[1] The first four Central National policies, CNU 12-20-39, CNU 12-26-82, CNU 12-30-08, CNU 12-56-25, were issued in 1973 and provide indemnity limits of $9.95 million in excess of the limits of the underlying primary CGL policies. The remaining five Central National policies, CNU 12-79-39, CNU 03-31-78, CNU 03-49-44, CNU 00-40-80, CNU 00-81-61, each provide indemnity limits of $9.5 million in excess of the $50,000 self-insured retention and $450,000 limits of the underlying primary CGL policies. Like the Court of Appeal, we shall refer to all nine Central National excess/umbrella policies as the Central National policies.

[2] The United States Environmental Protection Agency (EPA) also instituted cleanup and abatement proceedings against Powerine pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 et seq.) for the cleanup of certain of its contaminated sites, and for the abatement of the effects of the contamination. Powerine has conceded it sought declaratory relief in its cross-action respecting its asserted right of indemnity only with regard to the pending state Regional Water Board proceedings. The EPA/CERCLA proceedings and any costs potentially incurred thereunder are not implicated here.

ordered the issuance of a writ directing entry of an order granting the primary insurers' summary adjudication motion on the duty to indemnify.[3] As noted, this court affirmed in *Powerine I, supra,* 24 Cal.4th 945, holding that the primary insurers had no duty to indemnify Powerine for costs or expenses incurred in connection with the Porter-Cologne administrative proceedings because the insurer's duty to indemnify under the standard CGL policy language is limited to money ordered by a court in a suit for damages. (*Id.* at pp. 960, 964.)

After *Powerine I* was decided, Central National moved for summary adjudication of the duty to indemnify under the Central National policies, resulting in the judgment giving rise to the instant writ proceeding. In its motion, Central National sought an order that, pursuant to *Powerine I* and *Foster-Gardner*, it has no duty to indemnify Powerine under its excess/umbrella policies for any sums expended by Powerine in connection with the Regional Water Boards' proceedings because no money had been ordered by a court in a suit for damages against the insured within the meaning of those policies. Powerine in turn argued that this court's holding in *Powerine I* was not controlling because the earlier writ proceeding involved only primary CGL policies which, Powerine argued, are different in nature, purpose, and wording than the excess/umbrella policies issued by Central National.

The trial court granted Central National's motion for summary adjudication. Pursuant to *Powerine I*, the trial court ruled that Central National has no duty to indemnify Powerine under its various policies for sums Powerine expends pursuant to the cleanup and abatement orders issued by the Regional Water Boards. The trial court focused on the policies' inclusion of the term "damages" in the insuring provisions, concluding, as this court did in *Powerine I*, that the term does not encompass environmental response costs ordered by an administrative agency outside the context of a lawsuit. The trial court rejected Powerine's argument based on the difference in purpose between its excess/umbrella policies and the primary CGL policies at issue in *Powerine I*, reasoning it could not apply a meaning to "damages" that changes from policy to policy.

The insuring language of Central National's standard form excess/umbrella policies is identical throughout all nine policies. It provides, in relevant part: "The Company hereby agrees . . . to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability . . . imposed upon the Insured by law . . . *for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss'* on

---

[3] In the wake of our holding in *Foster-Gardner*, Powerine conceded that its insurers have no duty to defend it in the Regional Water Boards' administrative proceedings.

account of: . . . property damage . . . caused by or arising out of *each occurrence* happening anywhere in the world." (Italics added.) "Ultimate net loss" is defined as "the total sum which the Insured, or any company as his insurer, or both, become obligated to pay by reason of . . . property damage . . . either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder . . . ."

Seven of the nine Central National policies also contain defense coverage endorsements identical in substance to the duty to defend clauses of the primary CGL policies at issue in *Foster-Gardner* and *Powerine I*.[4] They obligate Central National to defend "any *suit* against the insured alleging liability insured under the provisions of this policy and seeking *damages* on account thereof," "[a]s respects *occurrences* covered under this policy, but not covered under the underlying insurance or under any other collectible insurance . . . ." (Italics added.) Each of the nine policies further contains an absolute pollution exclusion. Additional policy provisions deemed relevant to the issues raised herein are set forth and discussed, *post*.[5]

Powerine appealed from the trial court's order granting Central National's summary adjudication motion on the duty to indemnify under the policies. In a published decision, the Court of Appeal issued a writ of mandate directing the trial court to vacate its order and to issue a new order denying the motion. The court held that the duty to indemnify in these excess/umbrella policies is "broader in scope" than that of the policies in *Powerine I* and *Foster-Gardner*, "and includes the costs Powerine expends in responding to administrative agencies' cleanup and abatement orders." The court found that the term "expenses," as used in the insuring and "ultimate net loss" provisions, must be broadly construed to include costs arising from "compromise" as well as adjudication and third party "claims" as well as

---

[4] They differ insofar as the duty to defend is only triggered, or "drops down" to provide defense coverage, in the event a suit is filed against the insured respecting an occurrence covered under the policy but *not* covered under the underlying primary insurance.

[5] Powerine attached copies of all nine Central National excess/umbrella policies to its cross-complaint in the trial court, although only portions of the policies were relied on by Central National and referenced in the stipulation of facts in connection with its motion for summary adjudication in that court. The nine policies were also made a part of the record and considered by the Court of Appeal.

suits. The court concluded that the fact that the duty to defend (in seven of the nine policies) is limited to "suits seeking damages" under *Foster-Gardner* does not foreclose indemnity coverage under the so-called *Foster-Gardner* syllogism[6] because the wording of these policies is different than the standard CGL policy examined in *Powerine I* and *Foster-Gardner*. Finally, the Court of Appeal opined that the Central National policies are different in scope and purpose from the standard primary CGL policy in that they expressly provide umbrella coverage which can operate to " 'fill any gaps' " in higher-level primary coverage.

We granted Central National's petition for review. Amicus curiae briefs in support of Central National have been filed by the London Market Insurers and the Complex Insurance Claims Litigation Association. Amicus curiae briefs in support of Powerine have been filed by ITT Industries, Inc., and United Policyholders/Richard Giller.

## DISCUSSION

### 1. *Issue preclusion and law of the case*

At the threshold we address Central National's procedural argument that the judgment of the Court of Appeal in the *prior* writ proceeding culminating in *Powerine I*, which granted the London Market Insurers summary judgment on certain excess/umbrella policies issued by those insurers to Powerine, establishes law of the case and, under principles of issue preclusion, bars Powerine from here revisiting the matter of coverage for nonlawsuit expenditures under Central National's express/umbrella policies. (See, e.g., *Interinsurance Exchange of the Auto. Club v. Superior Court* (1989) 209 Cal.App.3d 177, 181 [257 Cal.Rptr. 37] [" '[A] former judgment . . . is a collateral estoppel on issues which were raised, *even though some factual matters or legal arguments which could have been presented were not.*' (7 Witkin [Cal. Procedure (3d ed. 1985) Judgment] § 257, p. 696, original italics.)"]; *Kowis v. Howard* (1992) 3 Cal.4th 888, 894 [12 Cal.Rptr.2d 728, 838 P.2d 250] [law of the case doctrine applicable to writ proceedings]; *McCutchen v. City of Montclair* (1999) 73 Cal.App.4th 1138, 1144 [87 Cal.Rptr.2d 95] [doctrine of issue preclusion applicable where issue in present proceeding is identical to one actually litigated and necessarily decided in prior proceeding].)

---

[6] The "*Foster-Gardner* syllogism," a phrase coined in *Powerine I*, can be summarized as follows: "The duty to defend is broader than the duty to indemnify. The duty to defend is not broad enough to extend beyond a 'suit,' i.e., a civil action prosecuted in a court, but rather is limited thereto. A fortiori, the duty to indemnify is not broad enough to extend beyond 'damages,' i.e., money ordered by a court, but rather is limited thereto." (*Powerine I, supra*, 24 Cal.4th at p. 961.)

This procedural argument was considered and rejected by the Court of Appeal on the following basis:

"Central National insists that our [now superseded] decision in *Powerine I* . . . precludes Powerine from arguing that the scope of coverage here is not limited to money ordered by a court. Observing that in our *Powerine I* decision we mentioned one umbrella and four excess policies issued by the [Certain Underwriters] insurer in addition to the primary policy, Central National asserts that that decision 'definitively resolved the identical issue,' namely, that 'no coverage exists for administratively imposed costs under [the insurer's] excess and umbrella policies covering damages that the insured is legally obligated to pay.' Central National argues any references we made to the umbrella policy in that opinion is law of the case and is binding on Powerine inasmuch as Powerine did not appeal from that issue and the issue was not addressed by the Supreme Court in *Powerine I*. Not so.

"First, we stated clearly in our [superseded] opinion that 'we are only concerned with the primary policy issued to Powerine by Certain Underwriters,' and 'we have no reason to reach or consider the several excess policies which Certain Underwriters also issued over a 20-year period . . . .' Such statements render any comments made about the secondary policies pure obiter dictum. Second, we quoted from the language of the excess and umbrella policies in that opinion. The language is materially different from the language at issue here because, inter alia, the policies' language does *not* '*more fully define*' the term 'damages' by reference to another clause in the policy. For these reasons, our opinion in *Powerine I* is neither law of the case nor binding on Powerine for anything involving the excess or umbrella policies there."

We do not necessarily agree with the Court of Appeal that statements made in its now superseded opinion in the prior writ proceeding (*Powerine I*) respecting the London Market Insurers' excess/umbrella policies were "pure obiter dictum." The Court of Appeal's judgment in that proceeding did, after all, grant summary adjudication in favor of those insurers on their excess/umbrella policies *in addition to* finding no coverage under their primary CGL policy. But the fact remains that the Central National policies here at issue were *not* directly at issue in *Powerine I*, nor, indeed, was Central National itself even a party to that earlier writ proceeding. And, as the Court of Appeal has indicated, the wording of the insuring provisions of the London Market Insurers' excess/umbrella policies is different than that of the Central National excess/umbrella policies here concerned. Finally, given that the parties' appeal in *Powerine I* presented only the issue of coverage for administratively ordered environmental cleanup costs under the standard primary CGL policy issued by the London Market Insurers (*Powerine I,*

*supra*, 24 Cal.4th at p. 950), this court had no occasion to directly address coverage issues concerning those insurers' excess/umbrella policies.

As will be explained, *post*, while insurance policies are a special category of contracts, they fundamentally remain contracts to which the ordinary rules of contractual interpretation must be applied. Whatever the Court of Appeal may have concluded about coverage under the London Market Insurers' excess/umbrella policies in the earlier writ proceeding, the fact remains that Central National's excess/umbrella policies are distinct contractual policies of insurance, and the express wording and provisions of Central National's policies were not before the lower courts in *Powerine I*.

As the Court of Appeal below observed, the now superseded opinion of the Court of Appeal in *Powerine I* contained statements to the effect that " 'we are only concerned with the primary policy issued to Powerine by Certain Underwriters,' " and " 'we have no reason to reach or consider the several excess policies which Certain Underwriters also issued over a 20-year period. . . .' " We further observe that in ultimately entering judgment on those excess insurance policies in favor of the insurers in the prior proceeding, the Court of Appeal appears to have focused on the circumstance that coverage under the London Market Insurers' *excess* policies could not be triggered because the underlying primary CGL policy was found not to provide coverage, and exhaustion of the limits of the underlying primary policy was a prerequisite to coverage under the *excess* policies. Thus, not only were Central National's excess/umbrella policies not directly at issue or considered in the prior writ proceeding, the umbrella or "drop down" coverage included in Central National's policies does not lend itself to the "exhaustion of limits" analysis by which the Court of Appeal in that proceeding determined there could be no indemnity coverage under the London Market Insurers' policies.

Accordingly, we conclude that Central National's procedural argument—that Powerine should be estopped from claiming coverage under the Central National excess/umbrella policies here at issue as a result of the Court of Appeal's judgment in the first writ proceeding—must be rejected.

### 2. *Standard of review and rules of insurance policy interpretation*

We next set forth the applicable standard of review and rules of insurance policy interpretation that govern resolution of the issue before us.

This second writ petition was presented to the trial court upon stipulated facts. The issue before both the trial court and the Court of Appeal was one of pure law: the interpretation of the indemnification obligation

under the insuring clauses of Central National's nine excess/umbrella policies issued to Powerine. "When determining whether a particular policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law. (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 818 [274 Cal.Rptr. 820, 799 P.2d 1253].)" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

■    "The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy." (*Smith Kandal Real Estate v. Continental Casualty Co.* (1998) 67 Cal.App.4th 406, 414 [79 Cal.Rptr.2d 52]; see *Powerine I, supra*, 24 Cal.4th at p. 972.)

■    In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts. We reiterated those rules in our decision in *Foster-Gardner*:

■    " 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; see *AIU* [*Ins. Co.* v. *Superior Court, supra,*] 51 Cal.3d at pp. 821–822.) 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' (*Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1264.) 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' (*AIU, supra*, 51 Cal.3d at p. 822.) 'If contractual language is clear and explicit, it governs.' (*Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1264.)" (*Foster-Gardner, supra*, 18 Cal.4th at p. 868.)

■    " 'A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.' (*Waller v. Truck Ins. Exchange, Inc.*[*, supra,*] 11 Cal.4th [at p.] 18, 44 Cal.Rptr.2d 370, 900 P.2d 619; *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) The fact that a term is not defined in the policies does not make it ambiguous. (*Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co., supra*, 5 Cal.4th at p. 866; *Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1264; *Castro* v. *Fireman's Fund American Life Ins. Co.* (1988) 206 Cal.App.3d 1114, 1120 [253 Cal.Rptr. 833].) Nor does '[d]isagreement concerning the meaning of a phrase,' or

' "the fact that a word or phrase isolated from its context is susceptible of more than one meaning." ' (*Castro* v. *Fireman's Fund American Life Ins. Co., supra,* 206 Cal.App.3d at p. 1120.) ' "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." ' (*Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1265, italics omitted.) 'If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' (*La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37 [36 Cal.Rptr.2d 100, 884 P.2d 1048].)" (*Foster-Gardner, supra,* 18 Cal.4th at p. 868.)

In *Powerine I*, we explained further that standard form policy provisions are interpreted under the same rules of construction. " '[W]hen they are examined solely on a form, i.e., apart from any actual agreement between a given insurer and a given insured, the rules stated above apply *mutatis mutandis*. That is to say, where it is clear, the language must be read accordingly, and where it is not, in the sense that satisfies the hypothetical insured's objectively reasonable expectations.' " (*Powerine I, supra*, 24 Cal.4th at p. 957, quoting *Buss v. Superior Court* (1997) 16 Cal.4th 35, 45 [65 Cal.Rptr.2d 366, 939 P.2d 766].)

### 3.   *The holdings in* Foster-Gardner, Powerine I, *and* AIU

Powerine's principal contention is that our holding in *Powerine I* does not control the interpretation of Central National's policies because the literal insuring language of these excess/umbrella policies is both different and broader in scope and purpose than the insuring language of the standard primary CGL policy considered in *Powerine I*.

Before turning to the specific insuring language of Central National's nine excess/umbrella policies, a brief review of this court's holdings in *Foster-Gardner, Powerine I*, and *AIU Ins. Co. v. Superior Court, supra*, 51 Cal.3d 807 (*AIU*), is necessary to properly inform our inquiry.

### a.   Foster-Gardner

Our analysis in *Powerine I* relied in part on our earlier holding in *Foster-Gardner*, the salient points of which we summarized as follows:

■   "In *Foster-Gardner*, we held that the insurer's duty to defend the insured in a 'suit seeking damages' under the standard comprehensive general

liability insurance policy was limited to a civil action prosecuted in a court. (*Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra,* 18 Cal.4th at pp. 878–888.)

"There, we took what we referred to as a 'literal' approach to the provision imposing on the insurer the duty to defend the insured in a 'suit seeking damages.' (*Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra,* 18 Cal.4th at p. 869.) In doing so, we considered the provision in its full context; we proceeded to find, in effect, that it was clear in its limitation to a civil action prosecuted in a court, and that, in such limitation, it did not run counter to the hypothetical insured's objectively reasonable expectations. (*Id.* at pp. 869–871, 878–888.) We declined to take either a 'functional' or a 'hybrid' approach (*id.* at p. 869), each of which treats the provision as 'ambiguous' (*id.* at p. 872), the former deeming 'suit' to reach anything that is equivalent to a suit, apparently without qualification (*id.* at p. 871 & pp. 871–872, fn. 7), the latter deeming 'suit' to reach anything that is equivalent to a suit, but 'only if it is sufficiently coercive and threatening' (*id.* at pp. 871–872 & p. 872, fn. 8). We declined to take either approach because the duty to defend involved a 'suit,' and not something equivalent to a suit or even something equivalent to a suit that was sufficiently coercive and threatening. (*Id.* at pp. 872, 879.)" (*Powerine I, supra,* 24 Cal.4th at p. 959, fn. omitted.)

"In light of the foregoing, we went on to conclude that the insurer's duty to defend the insured did not extend to a proceeding conducted before an administrative agency pursuant to an environmental statute . . . . (*Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra,* 18 Cal.4th at pp. 878–888.) Our reason was that a proceeding conducted before an administrative agency pursuant to an environmental statute does not constitute a 'suit,' i.e., a civil action prosecuted in a court, but rather implicates a 'claim.' (*Ibid.*)" (*Powerine I, supra,* 24 Cal.4th at pp. 959–960.)

"In arriving at our conclusion, we declined to rewrite the provision imposing the duty to defend in order to remove its limitation to a civil action prosecuted in a court. (*Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra,* 18 Cal.4th at pp. 886–888.) We would not do so for the insured itself, in order to shift to the insurer some or all of the potentially substantial costs that might be imposed on the insured in the course of a proceeding conducted before an administrative agency pursuant to an environmental statute. (*Id.* at pp. 886–887.) Neither would we do so for considerations of public policy, in order, perhaps, to bring such a proceeding to a timely and appropriate outcome through such a shifting of costs. (*Id.* at p. 888.) Our reason was that we do not rewrite any provision of any contract, including the standard policy underlying any individual policy, for any purpose. (*Ibid.*)" (*Powerine I, supra,* 24 Cal.4th at p. 960.)

### b. Powerine I

■ While *Foster-Gardner* interpreted the scope of the duty to defend under the standard CGL policy, *Powerine I* addressed the scope of the duty to indemnify under that same standard policy, in the form utilized by the London Market Insurers below. (*Powerine I, supra,* 24 Cal.4th at p. 950.) As noted, we held in *Powerine I* that "the insurer's duty to indemnify the insured for 'all sums that the insured becomes legally obligated to pay as *damages*' under the standard [CGL] insurance policy is limited to money ordered by a court." (*Id.* at pp. 960, 964, italics added.)

■ In the analysis that followed, we explained that "the duty to indemnify and its limitation to money ordered by a court is sufficiently supported when we look to what we may call *Foster-Gardner*'s 'syllogism' alone." (*Powerine I, supra,* 24 Cal.4th at p. 960.) The syllogism can be summarized this way: "The duty to defend is broader than the duty to indemnify. The duty to defend is not broad enough to extend beyond a 'suit,' i.e., a civil action prosecuted in a court, but rather is limited thereto. A fortiori, the duty to indemnify is not broad enough to extend beyond 'damages,' i.e., money ordered by a court, but rather is limited thereto." (*Id.* at p. 961.) Put another way, the insurer's obligation to indemnify for "damages" is limited to "money ordered by a court" because the provisions in the standard CGL policy imposing both a duty to defend and a duty to indemnify on the insurer each "link[] 'damages' to a 'suit,' i.e., a civil action prosecuted in a court." (*Powerine I, supra,* 24 Cal.4th at p. 962.)

■ In reaching our holding in *Powerine I*, we distinguished between the term "damages" used in the insuring agreement of the standard CGL policy, and the term "expenses," which does not appear in the insuring provisions of that standard policy. The duty to indemnify for *"damages,"* we explained, "does *not* extend to any *expenses* required by an administrative agency pursuant to an environmental statute—specifically, here, proceedings conducted before the Regional Water Boards pursuant to the Porter-Cologne Act. Our reason is that expenses required by an administrative agency pursuant to an environmental statute, whether for the cleanup of a contaminated site and the abatement of the contamination's effects or otherwise, do not constitute money ordered by a court." (*Powerine I, supra,* 24 Cal.4th at p. 966, italics added.)

■ As the Court of Appeal below correctly observed, "Read together, *Foster-Gardner* and *Powerine I* stand for the proposition that the duty to defend a 'suit' seeking 'damages' under the standard CGL policies is re-

stricted to civil actions prosecuted in a court, initiated by the filing of a complaint, and does not include *claims*, which can denote proceedings conducted by administrative agencies under environmental statutes. Likewise, the duty to indemnify for ' "all sums that the insured becomes legally obligated to pay as *damages*" ' (*Powerine I, supra,* 24 Cal.4th at p. 961, italics added) in the same standard primary policies is limited to money ordered by a court, and does not include *expenses* such as may be incurred in responding to administrative agency orders."

### c. AIU

In *AIU, supra,* 51 Cal.3d 807, a unanimous opinion authored by then Chief Justice Lucas, we were called upon to determine whether various primary and excess CGL policies issued to real party in interest FMC Corporation (FMC) obligated the insurers to provide coverage to FMC for contamination cleanup and other environmental response costs incurred pursuant to CERCLA (42 U.S.C. § 9601 et seq.) and related state and federal environmental laws. FMC sought review of a peremptory writ of mandate issued by the Court of Appeal that had directed the superior court to enter summary adjudication on this issue in favor of the insurers. We reversed. (*AIU, supra,* 51 Cal.3d at pp. 813–814.)

The insurance policies at issue in *AIU* provided coverage to FMC for all sums FMC became legally obligated to pay as "damages" (under two standard policy forms) or "ultimate net loss" (under a third) as a result of "property damage" within the meaning of the policies. (*AIU, supra,* 51 Cal.3d at p. 814.) Several of the policies in the latter category contained insuring language substantially identical to the insuring provisions in Central National's excess/umbrella policies. (*Id.* at pp. 814–815 & fn. 2.)

We explained in *AIU* that "[u]nder established principles of contract interpretation, we construe policy language according to the mutual intentions of the parties and its 'plain and ordinary' meaning, resolving ambiguities in favor of coverage" (*AIU, supra,* 51 Cal.3d at p. 814). We concluded that all of the policies at issue afforded coverage for the costs of reimbursing government agencies and complying with injunctions ordering contamination cleanup under CERCLA and similar environmental statutes. (*Ibid.*)

*AIU* established early on that liability arising from government suits for injunctive relief and costs incurred in cleaning up polluted sites pursuant to an environmental statute fall within the definition of "property damage" found in standard form primary and excess CGL policies. (*AIU, supra,* 51

Cal.3d at p. 842.) We explained that "the mere fact that the governments may seek reimbursement of response costs or injunctive relief without themselves having suffered any intangible harm to a proprietary interest does not exclude the recovery of cleanup costs from coverage *under the 'damages' provision* of CGL policies." (*Ibid.,* italics added.)

Unlike this case, the government in *AIU* brought suit against the insured for remedial relief.[7] In *Powerine I* we explained that "We did not hold [in *AIU*] that the duty [to indemnify] extends to any money in addition to that ordered by a court—including any expenses required by an administrative agency pursuant to an environmental statute. Indeed, we did not even consider the issue." (*Powerine I, supra,* 24 Cal.4th at p. 966, italics omitted.) We had no occasion to consider the issue in *AIU* precisely because the government had brought suit; hence the facts of that case did not present it. Here, it is undisputed that the two cleanup and abatement orders were issued to Powerine through administrative proceedings and were not the result of court-ordered injunctive relief. The issue is squarely presented.

4. *The insuring agreement in Central National's excess/umbrella policies provides indemnity coverage for the liability of administratively ordered environmental response costs*

The insuring language in Central National's standard form excess/umbrella policies is identical throughout all nine policies. It provides, in relevant part: "The Company hereby agrees . . . to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability . . . imposed upon the Insured by law . . . for *damages*, direct or consequential *and expenses, all as more fully defined by the term 'ultimate net loss'* on account of: . . . . property damage . . . caused by or arising out of each occurrence happening anywhere in the world." (Italics added.)

"Ultimate net loss" in turn is defined as "the total sum which the Insured, or any company as his insurer, or both, become obligated to pay by reason

---

[7] "The insured in *AIU*, who had allowed hazardous wastes to contaminate groundwater, was ordered to reimburse the government for its cleanup and response costs under [CERCLA]. One of the questions before us was whether *the government's suit* for reimbursement of cleanup costs was *an action for 'damages'* within the meaning of a CGL policy. We held that *the suit* did seek 'damages' because *the judgment awarding reimbursement was analogous to a judgment awarding damages for injury to property*, measured by the cost of restoring the property to its original condition. Under the applicable statutes, the government could have proceeded against the insured either by requiring the insured to take remedial action or by taking remedial action itself and *suing* for reimbursement. The government chose the latter alternative. (*AIU, supra,* 51 Cal.3d at pp. 829–837.)" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1269–1270 [10 Cal.Rptr.2d 538, 833 P.2d 545], italics added.)

of . . . property damage . . . *either through adjudication or compromise, and shall also include* hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for *litigation, settlement, adjustment and investigation of claims and suits* which, are paid as a consequence of any occurrence covered hereunder . . . ." (Italics added.)

■ The mutual intention of the parties is to be inferred, if possible, solely from the written provisions of the contract. Where contractual language is clear and explicit, it governs. (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1264; *AIU, supra,* 51 Cal.3d at p. 822.) Like the Court of Appeal, we conclude that coverage under Central National's excess/umbrella policies is unambiguous and clearly extends beyond money ordered by a court.

The phrase "obligated to pay by reason of the liability . . . imposed upon the Insured by law" in the insuring agreement of Central National's excess/umbrella policies is the functional equivalent of the phrase "sum that the insured becomes legally obligated to pay" in the standard CGL policy considered in *Powerine I.* (See *AIU, supra,* 51 Cal.3d at pp. 814–815 ["legally obligated" and "obligated . . . by law" treated as similar].) Both connote a legal obligation in the "abstract." (*Powerine I, supra,* 24 Cal.4th at p. 963.) In the standard primary CGL policy, it is the addition of the single word "damages" that limits the indemnification obligation to money ordered by a court. (*Ibid.*)

The insuring clause of the Central National excess/umbrella policies, in contrast, provides indemnification coverage for "damages, direct or consequential *and expenses* . . . ." "The use of both terms raises the inference that they were not intended to be synonymous." (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 811 [180 Cal.Rptr. 628, 640 P.2d 764].) In *Powerine I* we ourselves used the term "expenses" when explaining that "*expenses* required by an administrative agency pursuant to an environmental statute, whether for the cleanup of a contaminated site and the abatement of the contamination's effects or otherwise, do not constitute money ordered by a court." (*Powerine I, supra,* 24 Cal.4th at p. 966, italics added.) Surely then, an insured would harbor an objectively reasonable expectation that these policies also afforded coverage for such expenses, something above and

beyond court-ordered "damages." We agree with the Court of Appeal that the addition of the term "expenses" in the central insuring clause of these excess/umbrella policies extends coverage beyond the limitation imposed were the term "damages" used alone, and thereby enlarges the scope of coverage beyond "money ordered by a court."

In addition to the inclusion of the term "expenses," which itself broadens the scope of coverage beyond that afforded under the standard primary CGL policy, the central insuring clause of these policies "further define[s]" the indemnification obligation by reference to and incorporation of a definition of "ultimate net loss." "Ultimate net loss" in turn is defined as the total sum which the insured becomes "obligated to pay by reason of . . . property damage . . . either through adjudication *or compromise, and shall also include . . . all sums paid . . .* for litigation, *settlement, adjustment and investigation of claims* and suits . . . as a consequence of any occurrence covered hereunder . . . ." (Italics added.)

█ Sums that the insured becomes legally "obligated to pay" through "adjudication" denote court-ordered money damages. But sums the insured becomes legally "obligated to pay" through "compromise" or the "settlement, adjustment and investigation of claims" do not necessarily reflect an underlying court suit. As the Court of Appeal observed, "A compromise may be reached in order to avert a lawsuit altogether." Moreover, as we explained in *Foster-Gardner*, a "claim" is not a "suit." A claim " 'can be any number of things, *none of which rise to the formal level of a suit* . . . . While a claim may ultimately ripen into a suit, *"claim" and "suit" are not synonymous.'* [Citations.]" (*Foster-Gardner, supra,* 18 Cal.4th at p. 879, quoting *Fireman's Fund Ins. Co. v. Superior Court* (1997) 65 Cal.App.4th 1205, 1216 [78 Cal.Rptr.2d 418], italics added.)

█ Finally, as explained, this court has already held in *AIU, supra,* 51 Cal.3d 807, that a court order for payment of expenses to remediate or abate pollution pursuant to an environmental statute constitutes liability for "property damage" within the meaning of the standard primary CGL policy. (*Id.* at pp. 831, 842.) It follows that where the express insuring language of an excess/umbrella policy broadens indemnity coverage for sums paid in furtherance of a "compromise" or "settlement" of a "claim" initiated by an

administrative agency for such remedial relief, the insured's liability for such expenses falls within the policy's indemnification obligation even though no government suit was filed.

■ We therefore conclude that under a literal reading of Central National's excess/umbrella policies, the indemnification obligation is expressly extended beyond court-ordered money "damages" to include expenses incurred in responding to government agency orders administratively imposed outside the context of a government lawsuit to clean up and abate environmental pollution.

We reach the same conclusion when considering the insuring provisions of these policies in the context of the policies as a whole. (*Powerine I, supra,* 24 Cal.4th at p. 961; *Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265.) Central National argued in the Court of Appeal that these policies were intended to operate primarily as excess insurance policies,[8] i.e., following the form of the underlying policies adjudicated in *Foster-Gardner* and *Powerine I.* If that were the case, then the circumstance that the underlying primary CGL policies afforded no indemnity coverage by virtue of our holding in *Powerine I* would end the inquiry, as the limits of those underlying policies were not exhausted for purposes of triggering "excess" coverage.

But the policies here in question are *not* merely intended to operate as excess insurance. Under the limitation of liability provision, Central National has agreed to pay the excess of "the amount of ultimate net loss . . . in respect of each occurrence *not covered by said underlying insurances.*" (Italics added.) Hence, these policies also provide umbrella coverage,[9] i.e., "alternative primary coverage as to losses 'not covered by' the primary policy." (*Reserve Insurance Co. v. Pisciotta, supra,* 30 Cal.3d at p. 812; see

---

[8] As a general matter, the term "excess coverage" refers to indemnity coverage that attaches upon the exhaustion of underlying insurance coverage for a claim. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶ 8:76, p. 8-39 ["Excess insurance ('the second layer') provides coverage after other identified insurance is no longer on the risk. 'Excess' means 'insurance that begins after a predetermined amount of underlying coverage is exhausted and that does not broaden the underlying coverage.' [Citations.]"].)

[9] The term "umbrella" coverage refers to coverage that "drops down" to cover occurrences that are not covered by underlying policies of insurance. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 8:83, p. 8-43 ["Umbrella policies are usually excess policies in the sense that they afford coverage that is excess over underlying insurance. [Citation]"; *id.,* ¶ 8:84, p. 8-43 ["An umbrella policy may provide *broader coverage than the underlying insurance*; i.e., umbrella coverage may 'fill any gaps in coverage left open by the primary coverage in addition to increasing the total possible recovery by the insured.' [Citations]"].)

*Century Indemnity Co. v. London Underwriters* (1993) 12 Cal.App.4th 1701, 1707, fn. 5 [16 Cal.Rptr.2d 393].) The umbrella coverage here may serve to " 'fill any gaps in coverage left open by the [underlying] coverage . . . .' " (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 8:84, p. 8-43.)

We agree with the Court of Appeal that "The fact these Central National policies also provide umbrella indemnity tells us that the insured would have expected the policies to grant broader coverage than that provided by the primary insurance. [Citation.] Our reading of the Central National insuring clause to be more expansive than the primary insurance in *Powerine I* gives effect to the mutual intent of the parties as evinced by the mechanism of umbrella insurance. [Citations.]"

### 5. *Central National's remaining arguments*

Central National raises a number of additional arguments in opposition to the conclusions reached by the Court of Appeal, none of which we find has merit.

### a. *Redundancy of the term "damages"*

First, Central National argues that to interpret the insuring provisions as affording coverage for the "expenses" of a compromise or settlement of a government claim for environmental cleanup and response costs would render the "damages" limitation in these policies redundant. We disagree.

The term "damages" in these policies serves the same purpose that it does in the standard primary CGL policy—it extends the indemnity obligation to "money ordered by a court" in a suit against the insured. Were the term not included in the policy language, the insurer could be heard to argue that coverage is not provided for court-ordered money judgments. As our decision in *Powerine I* implies, one reason the term "damages" limits coverage to money ordered by a court under the standard CGL policy is that there is no other term contained in the insuring clause of that policy that could serve to expand coverage. Here, in contrast, the central insuring provision extends coverage for "damages, direct or consequential *and expenses*" (italics added), and "further define[s]" the scope of the indemnity agreement through the definition of "ultimate net loss," which in turn defines coverage for liability

for property damage as including sums expended "either through adjudication *or compromise, and shall also include . . . all sums paid . . .* for litigation, *settlement, adjustment and investigation of claims* and suits . . . ." (Italics added.) There is no merit to Central National's assertion that to give effect to the literal terms of these policies would render the term "damages" in the insuring agreement a redundancy.

### b. *The insurer's right to approve out-of-court settlements*

Next, Central National argues that to construe the literal language of these policies as expanding coverage for the "expenses" of a compromise or settlement of a government claim for environmental response costs would mean that the insured could settle such claims without Central National's participation and obtain coverage under the policies for settlements to which Central National objected. Central National asserts that its right to participate in and approve any out-of-court settlement would be compromised under such an interpretation of the scope of coverage. It points to the "assistance and cooperation" clause as the source of that right. Again, we disagree.

As the Court of Appeal observed, Central National has failed to identify any language in these particular policies requiring that it approve out-of-court settlements or compromises *as a prerequisite to coverage.* Nor do we read the "assistance and cooperation" clause as linking any such right to the threshold question of coverage, much less making it a *prerequisite* to coverage under the policies. That clause provides, in pertinent part, that the insurer "shall have the right and shall be given the opportunity to associate with the Insured or the Insured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve the [Insurer] . . . ."

We believe the question whether these excess/umbrella policies afford coverage for environmental cleanup and response costs ordered outside the context of a lawsuit *turns on the literal language of the insuring agreement,* and is a *separate issue* from whether the insured has complied with the terms of the "assistance and cooperation" clause. Enforcement of the latter clause is not inherently incompatible with an interpretation of the insuring clauses as affording coverage for administratively ordered environmental cleanup. To be sure, failure to comply with the assistance and cooperation clause may furnish a defense to coverage. On this record, however, we know little about the communication and interaction, if any, between Powerine and Central

National during the period of negotiations between Powerine and the Regional Water Boards regarding the terms of the two cleanup and abatement orders. Compliance with the "assistance and cooperation" clause is a matter that remains to be addressed on remand.

Even assuming the insured has fulfilled its duty under the assistance and cooperation clause of promptly notifying and attempting to involve the insurer in its negotiations with the government agency, under Central National's interpretation of these policies, if the insurer in its discretion declines to participate in or approve any settlement, the insurer would have no obligation to indemnify the insured for administratively ordered cleanup costs. We believe this result would stand in conflict with the insuring agreement in these policies, which, as has been shown, by its literal language extends indemnity coverage for such liability.

    c.   *Absence of a "no action" clause*

    We further find significant the absence of a "no action" clause in the policies utilized by Central National. In *Powerine I*, we briefly discussed the standard form CGL policy's "so-called no-action provision, which, in typical language, generally states that 'no action' by a third party 'shall lie' against the insurer unless the insured's 'obligation to pay shall have finally been determined' either by a 'judgment' against the insured 'obtained after an actual trial' or by a 'settlement' reduced to contract to which the insurer 'agrees.' " (*Powerine I, supra,* 24 Cal.4th at p. 962, fn. 4, italics omitted.) Although the purpose of a "no action" clause is to discourage collusion between an insured and a third party claimant (see Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:439.6, p. 7A-116), the language of the standardly worded clause does appear to spell out the insurer's right to approve any out-of-court settlement, at least for purposes of making it a condition precedent to any suit brought directly against the insurer. Central National, however, chose not to include a "no action" clause in its policies. We will not rewrite the policies to insert a provision that was omitted. (*Powerine I, supra,* 24 Cal.4th at p. 960; *Foster-Gardner, supra,* 18 Cal.4th at pp. 886–888.)

    d.   *Function of the definition of "ultimate net loss" as "burning limits"*

Central National also faults the Court of Appeal's understanding of the function served by the definition of "ultimate net loss" in the insuring

agreement. According to Central National, that clause largely serves the purpose of "burning limits," i.e., reducing the indemnity limits "dollar for dollar by defense costs until zero is reached and the duty to indemnify . . . [is] then terminated. [Citation.]" (*Aerojet-General Corp. v. Transport Indem. Co.* (1997) 17 Cal.4th 38, 76, fn. 29 [70 Cal.Rptr.2d 118, 948 P.2d 909].) Central National and its amici curiae argue that where the "ultimate net loss" clause serves to consume policy limits, the clause cannot also be understood as expanding coverage. Once again, we disagree.

As the Court of Appeal observed, "these Central National policies lack [an explicit] provision indicating the policies function as 'self-consuming' or 'burning limits' contracts. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:357, p. 7A-90 (rev. # 1 1998).) Had Central National wanted to include a burning limits clause, it knew how to do so." In any case, even if the definition of "ultimate net loss" also serves the function of "burning limits," it is clear from the literal wording of the central insuring provision that the "ultimate net loss" definition also serves the function of "further defin[ing]" the scope of indemnity coverage under these policies well beyond "damages," i.e., money ordered by a court. To conclude otherwise would belie the explicit policy language and hardly comport with the objectively reasonable expectations of the insured.

### e. *The "loss payable" clause*

Central National's excess/umbrella policies also contain the standard "loss payable" clause.[10] Central National argued in the Court of Appeal that "where the underlying policies only indemnify for damages in the form of money ordered by a court pursuant to *Powerine I*, the loss payable condition 'evidences the same intent to cover damages arising in a judicial context or in a settlement . . . *reached with the insurer's consent.*' " (Italics added.) Powerine in turn argued that under the loss payable clause, the insurer's obligation to pay *can be triggered* by the insured's payment of any expenses included within the definition of "ultimate net loss," without a court-ordered judgment for the payment of money damages *or* an insurer-approved settlement.

---

[10] The "loss payable" clause provides: "Liability under this policy with respect to any occurrence shall not attach unless and until the Insured, or the Insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence. The Insured shall make a definite claim for any loss for which the Company *may* be liable under the policy within 12 months after the Insured shall have paid an amount of ultimate net loss in excess of the amount borne by the Insured *or* after the Insured's liability shall have been fixed and rendered certain either by final judgment against the Insured after actual trial *or* by written agreement of the Insured, the claimant, and the Company." (Italics added.)

It does not appear that the "loss payable" clause itself functions to trigger coverage in the first instance under these policies. The first sentence of the clause provides that the insurer's indemnification obligation under the policy does not commence until any underlying policy limits have been exhausted by actual payment of a covered loss. (See *Span, Inc. v. Associated Internat. Ins. Co.* (1991) 227 Cal.App.3d 463, 467–468 [277 Cal.Rptr. 828].) Accordingly, the provision speaks to the *timing* of the excess insurer's obligation to indemnify in relation to the exhaustion of underlying primary policy limits. (*Ibid.*) Here, the "excess" coverage afforded under these policies was not invoked because the limits of the underlying primary CGL policy were neither paid nor exhausted. Rather, it is the umbrella "drop down" aspect of coverage that is being looked to by the insured for coverage of liability for "property damage" incurred as a result of the administratively imposed remediation orders, liability not covered as "damages" by the underlying primary policy. In any event, whatever be the scope and effect of the "loss payable" provision contained in these policies which afford both excess and umbrella coverage, it cannot defeat the scope of coverage established under the literal language of the insuring clauses.

### f. *Application of the* Foster-Gardner *syllogism*

As noted, seven of the nine Central National policies contain a defense coverage endorsement adding a duty to defend to those policies. Central National argues that those endorsements provide a duty to defend substantially identical to the duty to defend found in the standard primary CGL policy, and hence, as regards those seven policies, the *Foster-Gardner* syllogism announced in *Powerine I* must be applied to defeat coverage.

A syllogism is deductive reasoning. (Webster's 3d New Internat. Dict. (1981) p. 2315, col. 3.) As the Court of Appeal observed, "The [*Foster-Gardner*] syllogism does not apply here for the simple reason that the parties contracted for full indemnity as declared by the broad language of the excess/umbrella policies themselves. The actual words used in the Central National policies' indemnity provision confer broader coverage than those contained in the defense coverage endorsement, or in *Powerine I* and *Foster-Gardner*. Hence, the conclusion of the *Foster-Gardner* syllogism does not logically follow from its premise when applied to the Central National policies." We agree with the Court of Appeal.

We further observe that the defense coverage endorsements in question provide that "nothing herein contained shall vary, alter, waive or extend any of the terms, representations, conditions or agreements of the policy other than as above stated." Particularly in light of this language, it would not be objectively reasonable for the insured in this case to expect that the duty to

defend endorsements contained in seven of the nine excess/umbrella policies would alter, much less defeat or override, the express terms of the insuring agreement. Moreover, unlike the standard primary CGL policy, excess/umbrella policies do not as a matter of course contain a duty to defend, as evidenced by the very policies here in question. From an equitable standpoint, it would be manifestly unfair to penalize the insured for paying a premium to obtain added protection by concluding that the defense coverage endorsements purchased for the seven policies defeat indemnity coverage otherwise clear under the literal policy language.

g. *"Expenses" construed narrowly as "litigation expenses"*

Finally, at oral argument, Central National urged that the term "expenses" contained in the central insuring clauses of these excess/umbrella policies should be read as referring only to the "expenses" of litigation where a court suit has been brought. The argument will simply not hold up to a plain reading of the literal terms of the insuring clause and coupled definition of "ultimate net loss."

In conclusion, we have explained that the provisions of an insurance policy will be considered ambiguous when they are capable of two or more constructions, both of which are reasonable. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th 1, 18.) We find no ambiguity here. The literal wording of the insuring clauses of Central National's nine excess/umbrella policies extends indemnity coverage to the "expenses" of responding to the environmental cleanup orders imposed on Powerine through the Regional Water Boards' administrative proceedings pursuant to the Porter-Cologne Act. We have considered all aspects of Central National's contrary arguments and conclude they do not furnish a reasonable alternative construction of the policy language. The literal language of the policies controls, as does the objectively reasonable expectations of Powerine, the insured.

As indicated at the outset, noncompliance with key policy provisions establishing conditions precedent to coverage, or exclusion clauses yet to be litigated, could ultimately defeat coverage under these policies according to the evidence developed as this litigation progresses. (See *AIU, supra,* 51 Cal.3d at p. 814 ["Although many of the policies contain exclusions arguably relevant to whether environmental cleanup costs are covered, we do not consider the applicability of exclusions in this case, which comes to us on motion for summary adjudication solely as to the coverage clauses."].) We hold only that the nature of the coverage sought by Powerine under these excess/umbrella policies is encompassed within the insuring language in the first instance, as a matter of law.

CONCLUSION

The judgment of the Court of Appeal directing the trial court to enter an order denying the insurer's motion for summary adjudication of the duty to indemnify is affirmed, and the matter remanded to the Court of Appeal for further proceedings consistent with the views expressed herein.

George, C. J., Kennard, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

On October 26, 2005, the opinion was modified to read as printed above.