186 Cal.App.4th 1397 (2010)
CLARENDON AMERICA INSURANCE COMPANY, Cross-complainant and Respondent,
v.
STARNET INSURANCE COMPANY, Cross-defendant and Appellant.
No. G042353.
Court of Appeals of California, Fourth District, Division Three.
July 27, 2010.
*1400 Charlston, Revich & Wollitz, Howard N. Wollitz and Allan J. Favish for Cross-defendant and Appellant.
Foley & Lardner, Eileen R. Ridley and Patrick T. Wong for Cross-complainant and Respondent.

*1401 OPINION
FYBEL, J.

INTRODUCTION
We hold, as a matter of first impression, the provision in a commercial general liability (CGL) insurance policy requiring the insurer to "defend the insured against any `suit' seeking . . . damages" to which the insurance applies includes the duty to defend the insured in proceedings under the Calderon Act, Civil Code section 1375 et seq. (All further code references are to the Civil Code unless otherwise noted.) Because the trial court reached the same conclusion, we affirm the judgment.
The CGL policies in issue, as all standard CGL policies, define "suit" to mean "a civil proceeding in which damages . . . to which this insurance applies are alleged." The process prescribed by the Calderon Act (the Calderon Process) is a civil proceeding within this definition. The Calderon Act requires a common interest development association to satisfy certain dispute resolution requirements with respect to the builder, developer, or general contractor before the association may file a complaint in court for construction or design defects. (§ 1375, subd. (a).) Although the Calderon Process occurs before a complaint is filed and itself does not result in a judgment or court-ordered payment of money, the Calderon Process is an integral part of construction defect litigation initiated by a common interest development association.

FACTS AND PROCEDURAL HISTORY
Centex Homes (Centex) was the developer of a residential development in Simi Valley known as Westwood Ranch. In July 2006, the Westwood Ranch Homeowners Association, Inc., served a notice of commencement of legal proceedings pursuant to section 1375 et seq. (Calderon Notice) on Centex that set forth a list of alleged construction defects at Westwood Ranch.
WSM Transportation doing business as Sam Hill & Sons, Inc. (Sam Hill), was a subcontractor on the Westwood Ranch development. StarNet Insurance Company (StarNet) issued two successive policies of CGL insurance (the StarNet CGL policies) to Sam Hill effective from June 12, 2002, to June 12, 2004.
The StarNet CGL policies' insuring agreement provides: "[StarNet] will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance *1402 applies." The StarNet CGL policies' defense agreement provides: "We will have the right and duty to defend the insured against any `suit' seeking those damages. However, we will have no duty to defend the insured against any `suit' seeking damages for `bodily injury' or `property damage' to which this insurance does not apply. We may, at our discretion, investigate any `occurrence' and settle any claim or `suit' that may result."
The StarNet CGL policies define the word "suit" as follows: "`Suit' means a civil proceeding in which damages because of `bodily injury[,'] `property damage' or `personal and advertising injury' to which this insurance applies are alleged. `Suit' includes: [¶] a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or [¶] b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent."
The StarNet CGL policies named Centex as an additional insured pursuant to the terms of the subcontract between Centex and Sam Hill.
Clarendon America Insurance Company (Clarendon) had issued a CGL insurance policy to another subcontractor, Ebensteiner Company. Centex was afforded coverage as an additional insured under the Clarendon CGL policy issued to Ebensteiner Company.
In December 2007, Centex filed a complaint against Clarendon seeking payment of defense fees and costs incurred in defending against the Calderon Notice. Clarendon filed a cross-complaint against the additional insurers, including StarNet, seeking a declaration they were obligated to provide Centex a defense and/or coverage. In the first amended cross-complaint, Clarendon sought indemnity, declaratory relief, and contribution from the additional insurers. Clarendon reached settlements with and dismissed the insurer cross-defendants except StarNet.
StarNet moved for summary judgment asserting the Calderon Notice and the Calderon Process did not constitute a "suit" within the meaning of the defense agreement in the StarNet CGL policies. In the tentative ruling, the trial court concluded the Calderon Process is a civil proceeding in which damages are alleged and therefore falls within the StarNet CGL policies' definition of "suit." The court stated: "Additionally, the definition of `suit' also includes alternative dispute resolution procedures to which the insured submits with the insurer's consent. It is not clear whether `consent' means only voluntary consent or may also include legally mandated consent, i.e. `consent' to the mandatory requirements of the Calderon process. Thus, even if the Calderon process is not considered to be a `civil proceeding' if that *1403 phrase is narrowly interpreted to mean `court action[,'] but rather is considered an `alternative dispute resolution proceeding[,'] there is a question of fact as to whether or not Star[N]et has a duty to defend once the Calderon process has begun." After the hearing, the trial court denied StarNet's motion based on the tentative ruling.
After the trial court denied StarNet's motion for summary judgment, StarNet and Clarendon stipulated to entry of judgment in Clarendon's favor with the express proviso that StarNet retained the right to appeal from the judgment. In June 2009, judgment based on the stipulation was entered in Clarendon's favor on the cross-complaint. StarNet timely appealed from the judgment.[1]

DISCUSSION

I.

Standard of Review and Rules of Insurance Policy Interpretation
Interpretation of an insurance policy is a question of law. (Powerine Oil Co., Inc. v. Superior Court (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589] (Powerine).) "`We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.' [Citations.]" (Ibid.)
(1) "In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts." (Powerine, supra, 37 Cal.4th at p. 390.) The ordinary rules of contract interpretation apply to an insurance policy. (Ibid.) The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties, which is to be inferred, if possible, solely from the *1404 written terms of the contract. (Ibid.) The contract language governs if it is clear and explicit. (Ibid.) The same rules of construction apply to standard form policy provisions. (Id. at p. 391.)
(2) The duty to defend is broader than the duty to indemnify. (Montrose Chemical Corp. v. Superior Court (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) An insurer has a duty to defend a suit which potentially seeks damages within the policy's coverage, and an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. (Ibid.)

II.

The Calderon Act
(3) The Calderon Act, passed by the Legislature in 1995, requires common interest development associations to give notice to a builder, developer, or general contractor of construction or design defects before suing. (§ 1375, subds. (a), (b).) The Calderon Act's purpose is to encourage settlement of construction and design defect disputes and to discourage unnecessary litigation. (El Escorial Owners' Assn. v. DLC Plastering, Inc. (2007) 154 Cal.App.4th 1337, 1354 [65 Cal.Rptr.3d 524].)
An association must satisfy all of the requirements of the Calderon Act before it may file a complaint for damages based on design or construction defects against a builder, developer, or general contractor of a common interest development. (§ 1375, subd. (a).)[2] To commence the Calderon Process, an association serves a "Notice of Commencement of Legal Proceedings" on the general contractor, called the respondent. (§ 1375, subds. (a), (b).) The Calderon Notice must list the alleged defects and describe the "results of the defects." (§ 1375, subd. (b)(2), (3).) Service of the Calderon Notice triggers a period of time, not to exceed 180 days, during which "the association, the respondent, and all other participating parties shall try to resolve the dispute through the processes set forth in [section 1375]." (§ 1375, subd. (c).)
(4) Within 60 days of receipt of the Calderon Notice, the respondent must provide written notice to all "subcontractors, design professionals, their insurers, and the insurers of any additional insured whose identity is known *1405 to the respondent." (§ 1375, subd. (e)(2).) The notice to subcontractors, design professionals, and insurers must specify the date and manner by which the parties shall meet and confer to select a "dispute resolution facilitator." (Ibid.) This notice also must include these advisements: (1) the recipient has an obligation to participate in the meet and confer, (2) the recipient will waive any challenge to the selection of the dispute resolution facilitator by failing to participate in the meet and confer, and (3) the recipient will be bound by any settlement reached through the Calderon Process. (Ibid.) The subcontractors and design professionals have 10 days from written acknowledgement of receipt of notice to submit a statement of insurance listing all their insurance carriers whose policies were in effect during the construction of the project and potentially cover the claims, and identifying the applicable policy numbers. (§ 1375, subd. (e)(2)(A), (B).)
(5) The parties then select a dispute resolution facilitator "to preside over the mandatory dispute resolution process." (§ 1375, subd. (f)(1).) Within 100 days of service of the Calderon Notice, the dispute resolution facilitator must hold a case management meeting at which the parties must reach agreement on a case management statement providing that certain events will take place in a prescribed order. (§ 1375, subds. (f)(1), (h).) The final event is a "[f]acilitated dispute resolution of the claim, with all parties, including peripheral parties, as appropriate, and insurers, if any, present and having settlement authority." (§ 1375, subd. (h)(8).)
To be released from the Calderon Process, a subcontractor or design professional must petition the dispute resolution facilitator. The petition must show that the subcontractor or design professional "is not potentially responsible for the defect claims at issue." (§ 1375, subd. (m).)
(6) If the dispute resolution described in section 1375 does not settle the matter, then the association or its assignee may file a complaint. (§ 1375.05, subd. (a).)[3] For purposes of assigning trial priority, the complaint is deemed filed on the date of service of the notice of commencement of legal proceedings described in section 1375, subdivision (b). (§ 1375.05, subd. (b).) Any respondent, subcontractor, or design professional who received timely notice of the inspections or testing conducted under section 1375 is prohibited from engaging in additional inspection and testing unless, on noticed motion, the trial court determines the respondent, subcontractor, or design professional falls within one of the listed exceptions. (§ 1375.05, subd. (c).)
*1406 Section 1375.05, subdivision (d) states, "[a]ny subcontractor or design professional who had notice of the facilitated dispute resolution conducted under Section 1375 but failed to attend, or attended without settlement authority, shall be bound by the amount of any settlement reached in the facilitated dispute resolution in any subsequent trial, although the affected party may introduce evidence as to the allocation of the settlement."

III.

The StarNet CGL Policies Impose a Duty to Defend the Calderon Process.
The insuring agreement and defense agreement of the StarNet CGL policies provide: "[Star Net] will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies. We will have the right and duty to defend the insured against any `suit' seeking those damages." (Italics added.) Is the Calderon Process a "suit" under the StarNet CGL policies?
The StarNet CGL policies define "suit" as (1) "a civil proceeding in which damages because of `bodily injury[,'] `property damage' or `personal and advertising injury' to which this insurance applies are alleged"; (2) "[a]n arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent"; or (3) "[a]ny other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent." Definition No. 2 can be eliminated at the outset from our analysis because neither Clarendon nor StarNet contends the Calderon Process is an arbitration.
Clarendon argues the Calderon Process falls within definition No. 1 because it is a civil proceeding alleging damages to which the insurance applies. StarNet argues the Calderon Process is not a suit under definition No. 1 because it cannot result in a party being legally obligated to pay damages. Neither Clarendon nor StarNet asserts an ambiguity in the StarNet CGL policies' definition of "suit."
In Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 887 [77 Cal.Rptr.2d 107, 959 P.2d 265] (Foster-Gardner), the court took a bright-line, literal approach to a provision in a CGL policy imposing on the insurer the duty to defend the insured in a "suit" seeking damages. The court concluded a "suit" is "a court proceeding initiated by the filing of a complaint." (Ibid.) Thus, the court held, the insurer had no duty to defend the insured in a proceeding conducted before an administrative agency, the *1407 Department of Toxic Substances Control, pursuant to the Carpenter-Presley-Tanner Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.) (Foster-Gardner, supra, 18 Cal.4th at pp. 878-888.)
The CGL policies in Foster-Gardner predated the StarNet CGL policies and did not define the word "suit." In 1986, the standard insurance form was amended to define "suit" as (1) "a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged.'" In 1988, the standard insurance form definition of "suit" was expanded to cover alternate dispute resolution with the intent "to encourage the use of any type of alternate dispute resolution technique." (Woodward et al., Commercial Liability Insurance (International Risk Management Institute, Inc. 2006) pp. V.L.210 to V.L.211.)
Defined as "a civil proceeding," a suit is broader than an action or law suit initiated by a complaint filed in court. Whether, or the extent to which, the term "civil proceeding" includes prelawsuit proceedings, such as administrative proceedings, has not been decided. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2009) ¶ 7:607.8, p. 7B-35 (rev. # 1, 2008).) One treatise takes the position a civil proceeding is limited to proceedings before a court or governmental authority: "The central point of this definition is the concept of a `civil proceeding[,'] namely a formal proceeding before a court or other legitimate governmental authority having the power to adjudicate and resolve controversies between or among individuals or private or public entities." (20 Appleman on Insurance 2d (Holmes ed. 2002) § 129.2[H], pp. 91-92.)
(7) In deciding the meaning of a term used in an insurance policy, courts typically adopt one of two positions: (1) the "literal meaning" approach or (2) the "functional equivalent" approach. (See Foster-Gardner, supra, 18 Cal.4th at pp. 869-872; 20 Appleman on Insurance, supra, § 129.2[H], p. 93.) In Foster-Gardner, the California Supreme Court used the literal meaning approach to conclude the word "suit," without further definition, means an action initiated by a complaint. (Foster-Gardner, supra, 18 Cal.4th at pp. 878-879.)
The Supreme Court's use of the literal meaning approach in Foster-Gardner to determine the meaning of "suit" leads us to conclude the literal meaning approach should be used to determine the meaning of the term "civil proceeding." In so doing, we consider the defense agreement in the StarNet CGL policies in full context. (Certain Underwriters at Lloyd's of London v. Superior Court (2001) 24 Cal.4th 945, 959 [103 Cal.Rptr.2d 672, 16 P.3d 94].)
*1408 (8) Under the literal meaning approach, the term "civil proceeding" encompasses the Calderon Process because it is a proceeding created by the Civil Code that is required before a common interest development association may file a complaint alleging construction or design defect damages. The Calderon Process begins with notice (§ 1375, subd. (b)), and, during the course of the Calderon Process, inspections and exchanges of documents similar to discovery are conducted (§ 1375, subd. (e)(1)); visual inspections and invasive tests are conducted (§ 1375, subd. (h)(3), (4)); a document depository is created (§ 1375, subd. (h)(1)); and the association must provide a "comprehensive demand" providing "sufficient detail for the parties to engage in meaningful dispute resolution as contemplated under this section" (§ 1375, subd. (h)(5)). For these reasons, we conclude the Calderon Process is a civil proceeding within the meaning of the policy.
The StarNet CGL policies (as do all standard CGL policies) limit the duty to defend to civil proceedings "in which damages . . . to which this insurance applies are alleged." (Italics added.) The California Supreme Court in Certain Underwriters at Lloyd's of London v. Superior Court, supra, 24 Cal.4th at page 960, concluded, "the insurer's duty to indemnify the insured for `all sums that the insured becomes legally obligated to pay as damages' under the standard comprehensive general liability insurance policy is limited to money ordered by a court." The verb "allege" has been defined to mean "to `plead' or `charge' matters having legal significance, or to `accuse' or `indict' someone in court. [Citations.]" (In re Eddie M. (2003) 31 Cal.4th 480, 496 [3 Cal.Rptr.3d 119, 73 P.3d 1115].) In defining the word "suit," the StarNet CGL policies distinguish between the words "alleged" and "claimed." The word "alleged" is used regarding damages in civil proceedings, while the word "claimed" is used regarding damages in arbitration and alternative dispute resolution. This distinction indicates the StarNet CGL policies use the word "alleged" in the formal sense meaning to plead or charge matters having legal significance.
In determining whether the Calderon Process is a civil proceeding in which damages are alleged, we must consider the Calderon Process in context as one partthe first stepin a continuous litigation process. The Calderon Process is tied directly and securely to an association's complaint for damages against a builder, developer, or general contractor based on construction or design defects. The Calderon Process is mandatory: The Calderon Act prohibits an association from filing a complaint for construction or design defects until it satisfies all of the requirements of the Calderon Process. (§ 1375, subd. (a).) During the course of the Calderon Process, the association must provide "a comprehensive demand" in sufficient detail to allow for meaningful settlement discussions. (§ 1375, subd. (h)(5).) Under section 1375.05, which was operative when the Calderon Process in this case *1409 occurred, a complaint is deemed to have been filed on the date of service of the Calderon Notice for purposes of assigning trial priority. (§ 1375.05, subd. (a).)
The procedures undertaken during and results of the Calderon Process are incorporated into and become part of the postcomplaint litigation. As noted, during the Calderon Process, various discovery-like procedures, tests, and inspections are undertaken, and, more significantly, "[a]ny respondent, subcontractor, or design professional who received timely prior notice of the inspections and testing conducted under Section 1375 shall be prohibited from engaging in additional inspection or testing . . ." unless the court, on noticed motion, finds that all five conditions to relief have been met. § 1375.05, subd. (c).) The amount of any settlement reached in the facilitated dispute resolution is binding in any subsequent trial on any subcontractor or design professional who received notice of the facilitated dispute resolution but failed to attend or attended without settlement authority. (§ 1375.05, subd. (d).)
The Calderon Process is more than a pre litigation alternative dispute resolution requirement: It is part and parcel of construction or design defect litigation initiated by an association and, as such, cannot be divorced from a subsequent complaint. This interpretation is supported by section 1375, subdivision (q), which states, "[t]he alternative dispute resolution process and procedures described in this section shall have no application or legal effect other than as described in this section." The Calderon Process is an integral part of the litigation process precisely because of the application and legal effect described in the Calderon Act. StarNet does not contend it would not have a duty to defend its insured in this case against a complaint arising out of an unsuccessful Calderon Notice and Calderon Process.
The function and significance of the Calderon Process in construction or design defect litigation, and the StarNet CGL policies' definition of "suit" to include civil proceeding, lead to the reasonable inference the parties' intended StarNet would have a duty to defend the insured in the Calderon Process. Extending the duty to defend to the Calderon Process is therefore consistent with a hypothetical insured's reasonable expectations. (Minkler v. Safeco Ins. Co. of America (2010) 49 Cal.4th 315, 321.)
(9) For all of these reasons, we conclude StarNet had a duty to defend in the Calderon Process in this case pursuant to the terms of the StarNet CGL policies. Because we reached that conclusion under the first definition of the word "suit" in the StarNet CGL policies, and the second definition is inapplicable, we do not address the third definition.

*1410 DISPOSITION
The judgment is affirmed. Respondent to recover costs incurred on appeal.
Rylaarsdam, Acting P. J., and Bedsworth, J., concurred.
NOTES
[1] "Although a consent or stipulated judgment is not normally appealable, an exception is recognized when `consent was merely given to facilitate an appeal following adverse determination of a critical issue.' [Citation.]" (Connolly v. County of Orange (1992) 1 Cal.4th 1105, 1111 [4 Cal.Rptr.2d 857, 824 P.2d 663].) "To be appealable the stipulated judgment must fully resolve all claims in the underlying litigation." (McMahon v. Craig (2009) 176 Cal.App.4th 222, 228, fn. 1 [97 Cal.Rptr.3d 555].) These requirements have been met in this case. The stipulated judgment resolved all the claims between Clarendon and StarNet and was entered with the trial court's approval to facilitate an appeal following a determination adverse to StarNet on the critical issue whether the Calderon Notice and Calderon Process come within the meaning of the word "suit" in the StarNet CGL policies.
[2] "Before an association files a complaint for damages against a builder, developer, or general contractor (`respondent') of a common interest development based upon a claim for defects in the design or construction of the common interest development, all of the requirements of this section shall be satisfied with respect to the builder, developer, or general contractor." (§ 1375, subd. (a), italics added.)
[3] Section 1375.05, subdivision (i) states: "This section shall become inoperative on July 1, 2010, and, as of January 1, 2011, is repealed, unless a later enacted statute that is enacted before January 1, 2011, deletes or extends the dates on which it becomes inoperative and is repealed." Section 1375.05 was operative at the time of the Calderon Process in this case.