KING, J.,
Dissenting. — As the moving party, the defendant has the burden of demonstrating there is no potential for coverage under the terms of its policy. (See Powerine Oil Co., Inc. v. Superior Court (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589] [defendant and moving party/nonparticipating insurer failed to meet its burden of showing that no potential for indemnity existed under terms of its policy on motion for summary adjudication]; see also Standard Fire Ins. Co. v. Spectrum Community Assn. (2006) 141 Cal.App.4th 1117, 1124 [46 Cal.Rptr.3d 804] [plaintiff and moving party insurer failed to meet its burden of showing there was no potential for *1189 coverage under the terms of its policy on motion for summary judgment]; Code Civ. Proc., § 437c, subd. (p)(2).)[1]
We independently review a trial court’s interpretation of the terms of an insurance contract, pursuant to well-settled rules of contract interpretation. (E.M.M.I. Inc. v. Zurich American Ins. Co. (2004) 32 Cal.4th 465, 470 [9 Cal.Rptr.3d 701, 84 P.3d 385] (E.M.M.I.).)
“ ‘The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the “mutual intention” of the parties. “Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The ‘clear and explicit’ meaning of these provisions, interpreted in their ‘ordinary and popular sense,’ unless ‘used by the parties in a technical sense or a special meaning is given to them by usage’ [citation], controls judicial interpretation. [Citation.]” ’ [Citation.]” (E.M.M.I., supra, 32 Cal.4th at p. 470.) “Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]” (AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) “ ‘ “If possible, the court should give effect to every provision. [Citations.] An interpretation which renders part of the [contract] to be surplusage should be avoided. [Citations.]” ’ ” (National City Police Officers’ Assn. v. City of National City (2001) 87 Cal.App.4th 1274, 1279 [105 Cal.Rptr.2d 237].)
“A policy provision is ambiguous when it is susceptible to two or more reasonable constructions. [Citation.] Language in an insurance policy is ‘interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.’ [Citation.] ‘The proper question is whether the [provision or] word is ambiguous in the context of this policy and the circumstances of this case. [Citation.]’ ” (E.M.M.I., supra, 32 Cal.4th at p. 470.) “In determining whether an ambiguity exists, a court should consider not only the face of the contract but also any extrinsic evidence that *1190 supports a reasonable interpretation. [Citation.]” (American Alternative Ins. Corp. v. Superior Court (2006) 135 Cal.App.4th 1239, 1246 [37 Cal.Rptr.3d 918].)
“Ambiguity ‘ “ ‘is resolved by interpreting the ambiguous provisions in the sense the [insurer] believed the [insured] understood them at the time of formation. [Citation.] If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. [Citation.]’ ‘This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, “the objectively reasonable expectations of the insured.” ’ ” [Citation.] “Any ambiguous terms are resolved in the insureds’ favor, consistent with the insureds’ reasonable expectations.” ’ [Citation.]” (E.M.M.I., supra, 32 Cal.4th at pp. 470-471.)
The policy provisions at the heart of the dispute are sections 5.7 and 5.10.
“5.7 ‘Insured Products’ shall mean all products including their ingredients and components once incorporated therein of the Insured that are in production or have been manufactured, packaged or distributed by or to the order of the Insured including any new products which QBE has accepted in writing as a new product under Clause 4.5.”
“5.10 ‘Malicious Product Tampering’ shall mean the actual or threatened intentional, malicious and illegal alteration or adulteration of the Insureds Products whether in conjunction with a Product Extortion Demand or not so as to give the Insured or consumers reasonable cause to consider the Insured Products unfit or dangerous for their intended use.”
The majority believes these provisions are clear and that no ambiguity exists. As stated by the majority; “Lloyds’s policy provides coverage for insured products and an insured event. An insured event involves product contamination or tampering. An ‘Insured Product’ means ‘all products including their ingredients and components once incorporated therein of the Insured that are in production or have been manufactured, packaged or distributed by or to the order of the Insured . . . .’In plainer language, [plaintiff and appellant Windsor Food Quality Company, Ltd.,] must show there was contamination or tampering with its product during or after manufacture, not before Windsor began the process.” (Maj. opn., ante, at p. 1186.) I believe this is incorrect.
I do not believe the majority is properly construing the policy. In my mind, the policy does not clearly and explicitly state what the majority says it does. Within the context of the present matter, the more reasonable reading of the *1191 policy is that the product, and all of its ingredients, are insured for adulteration regardless of when the adulteration occurs. Thus to the extent there are two reasonable interpretations, the policy is ambiguous and should be construed against the insurer;[2] the summary judgment should be denied.
Looking first to section 5.7, it provides; “ ‘Insured Products’ shall mean all products including their ingredients and components once incorporated therein of the Insured that are in production or have been manufactured, packaged or distributed by or to the order of the Insured including any new products which QBE has accepted in writing as a new product under Clause 4.5.”
In interpreting this section, the majority has focused on the words “once incorporated therein,” and concluded that this provision can be interpreted in only one way — “Windsor must show there was contamination or tampering with its product during or after manufacture, not before Windsor began the process.” (Maj. opn., ante, at p. 1186.) This interpretation is internally inconsistent.
By stressing the words “once incorporated therein,” the majority is interpreting the above section as indicating that adulteration of the ingredient must occur after the ingredient has become part of the product (i.e., the meat ingredient must be adulterated “once incorporated into” the burrito). I would suggest that if we accept this interpretation of when the ingredient must be adulterated, a large part of the production process would not be covered. While I am not familiar with the production of frozen burritos, I would think that the various ingredients of the burrito are at some point in time separate from each other or have been blended together without yet being placed into the tortilla. By adopting the majority’s emphasis on “once incorporated therein,” the meat or any other ingredient could be tampered with during the production process but before being “incorporated” into the burrito; as such, the adulteration would not be a covered loss. (The adulteration of the meat occurring before it was “incorporated therein.”) As a result, the “once incorporated therein” language as interpreted by the majority is in conflict with the other portion of the majority’s conclusion — that the tampering is covered if it occurs “during . . . manufacture.” (Maj. opn., ante, at p. 1186.)
If the ingredients have to be “incorporated therein” before the adulteration is covered, by definition adulteration that occurs “during” the production process is not covered because the ingredient has yet to be incorporated *1192 therein. The majority’s dual interpretations are mutually exclusive and not a reasonable reading of the provisions.[3]
Further, if we are to accept the general premise of the majority that coverage exists only for adulteration “during or after manufacture,” one would have to conclude that the majority is not only reading out of section 5.7, “including their ingredients and components once incorporated therein” (because as previously explained adulteration can occur during the manufacturing process yet before the ingredient has been incorporated therein), but also reading into section 5.10, occurring “during production, manufacturing, packaging or distribution” (maj. opn., ante, at p. 1186). To reach the majority’s interpretation of the words “once incorporated therein” and that the adulteration must occur during or after the manufacturing process, the two clauses by necessity would have to read as follows:
“5.7 ‘Insured Products’ shall mean all products including their ingredients and eompenents-once-incorporatcd therein of the Insured that are in production or have been manufactured, packaged or distributed by or to the order of the Insured including any new products which QBE has accepted in writing as a new product under Clause 4.5.”
“5.10 ‘Malicious Product Tampering’ shall mean the actual or threatened intentional, malicious and illegal alteration or adulteration of the Insureds Products [during production, manufacturing, packaging or distribution] whether in conjunction with a Product Extortion Demand or not so as to give the Insured or consumers reasonable cause to consider the Insured Products unfit or dangerous for their intended use.”
It is only after these modifications are made, that the policy can be plainly interpreted as the majority wishes.
Lastly, even language that may be plain and clear, as suggested by the majority, may be found as ambiguous when read in the context of the policy and the circumstances of the case. Here, the insured is Windsor Quality Food Company, Ltd., along with various named subsidiaries and divisions. As set forth in defendant’s undisputed statement of facts, No. 2, “[p]laintiff is a leading manufacturer and marketer of frozen ethnic foods, appetizers and other products [sic] food products purchased by consumers.” Within the context of the policy and the circumstances of the case, each party to the insuring agreement should well recognize that the insured produces and manufactures frozen foods. Perhaps with some exceptions, frozen ethnic *1193 foods and appetizers are nothing more than the compilation of various ingredients resulting in the product. In the case of a burrito, these ingredients end up resulting in a product where the individual ingredients are, in essence, inseparable; that is, it would be impossible to tamper with an ingredient after its incorporation into the product without tampering with the product as a whole. Thus, to conclude as does the majority, that the tampering with an ingredient must occur after the ingredient is “incorporated therein,” makes no sense. If such was the case, the policy need only provide for tampering with the “product.”
Simply stated, the phrase “once incorporated therein” found in section 5.7, does not modify when the tampering must occur, but rather when the adulterated ingredient becomes covered. Section 5.10 thereafter provides that the “Insured Product” must be “maliciously and illegally] alter[ed] or adulterated].” Section 5.10 does not provide a time constraint as to when the alteration or adulteration must occur. The adulteration of the ingredient can occur before it is incorporated into the product, but only becomes covered once it is incorporated into the product.
Taken together and reasonably read as a whole, the policy covers the present adulteration.
The majority relies on a number of cases which I believe are not applicable. It first references Caudill Seed & Warehouse Co. v. Houston Cas. Co. (W.D.Ky. 2011) 835 F.Supp.2d 329, 335-336, for the proposition that “[i]n order for a frozen burrito to qualify as an insured product, there must have been contamination or tampering during production, manufacture, packaging, or distribution — not because one of its ingredients supplied by a third party was adulterated.” (Maj. opn., ante, at p. 1186.) In Caudill, the plaintiff produced peanut products. Just as the meat here was tampered with prior to arriving at plaintiff’s plant, the peanuts in Caudill were contaminated before arriving at the plaintiff’s plant. The relevant policy provision in Caudill provided: “ACCIDENTAL PRODUCT CONTAMINATION [is]: [][] (1) any accidental or unintentional contamination, . . . during the manufacture, blending, mixing, compounding, ... of the Named Insured’s Products . . . .” {Id. at p. 333, italics added.) In finding no coverage, the court indicated: “After reviewing the language of the Policy, the Court finds that the Peanut Claim is not covered. The Court agrees that the impairment of the peanuts did not occur ‘during the manufacture, blending, mixing, compounding, packaging, ... of the Named Insured’s PRODUCTS.’ ” (Id. at pp. 335-336.) Our case is unlike Caudill. There, coverage was limited to contamination “during” the manufacturing process. Here, the word “during” is not used in any of the insuring sections. Thus, I do not believe Caudill stands for the proposition cited by the majority.
*1194 Next, the majority relies on The Limited, Inc. v. Cigna Ins. Co. (E.D.Pa. 2001) 228 F.Supp.2d 574, 580, for the point that the product tampering and accidental contamination insurance policy covers only instances of accidental contamination and product tampering and does not provide for product recalls in general. (Maj. opn., ante, at p. 1187.) I note initially that regardless of whether the present policy is a “recall policy,” section 1.3, subdivision (b) covers “[t]he reasonable and necessary costs and expenses of recall or withdrawal of Insured Products . . . .” Further, in The Limited, Inc., there was no contamination or product tampering. The issue was a defective canister into which the product had been placed; there was no evidence that the product or the canister had been contaminated or adulterated. There was merely a defective cap on the canister — a risk not covered by the policy. (Id. at p. 580.)
The majority relies on Ruiz Food Products v. Catlin Underwriting U.S., Inc. (E.D.Cal., Sept. 13, 2012, No. 1:11-cv-00889-BAM) 2012 WL 4050001, page *6, for the notion that: “ ‘Recalls generally, even if related to a belief that a product has been contaminated, does not qualify as a contamination under an accidental contamination policy.’ ” (Maj. opn., ante, at p. 1188.) Ruiz’s discussion and holding are inapplicable to the present facts. There, the issue was whether an ingredient in a beef spice mix which was produced by a downstream supplier, was contaminated. While some of the beef spice mix supplied to other manufacturers was contaminated, the beef spice mix supplied to Ruiz tested as being not contaminated. As indicated by the court, “[o]nly one lot of Basic’s HVP tested positive for Salmonella, and that particular lot was not sent to Superior, and thus, did not reach Ruiz.” (2012 WL 4050001 at p. *2.) In addressing the insurance policy, the court indicated that “accidental contamination” is “ ‘any accidental or unintentional contamination . . . provided that the use or consumption of Insured product(s): [¶] . . . Has resulted in or would result in clearly identifiable internal or external physical symptoms of bodily injury . . . .” (Id. at pp. *2-*3.) The court concluded by holding that because Ruiz’s product was not actually contaminated it would not result in bodily injury and therefore was not covered. In the present case, the policy does not require that the adulteration “result in clearly identifiable internal. . . physical symptoms of bodily injury. ” (Id. at p. *14.)
In sum, I do not believe the relevant policy provisions have the clear and explicit meaning that is placed upon them by the majority. When viewing the circumstances of the case, and sections 5.7 and 5.10 when read together, the policy provides coverage for adulteration of those individual ingredients incorporated into the product, with no time constraints as to when the ingredient must be adulterated.
*1195 As to defendant’s further arguments, I believe triable issues of fact exist as to whether the adulteration was malicious and illegal, as well as whether the adulteration was such as would “give the Insured or consumers reasonable cause to consider the Insured Products unfit or dangerous for their intended use.” There is evidence in the record that there was a class II recall, which means “a health hazard situation where there is a remote probability of adverse health consequences.” (United States Dept, of Agriculture Food Safety & Inspection Service <http://www.fsis.usda.gov/wps/portal/FSIS/ Topics/food-safety-education/get-answers/food-safety-fact-sheets/production- and-inspection/fsisfoodrecalls> [as of Feb. 26, 2015].) The Food Safety and Inspection Service designated the beef as unfit for human consumption and plaintiff was requested by the United States Department of Agriculture to comply with the requirements for the product recall. Further, there was no evidence submitted by defendant that the adulteration of the meat was not illegal and was not done with conscious disregard for the health and safety of others.
All told, I believe triable issues of material fact remain as to whether coverage exists for plaintiff’s losses.
Appellant’s petition for review by the Supreme Court was denied May 20, 2015, S225719.

 At trial, the plaintiff insured has the burden of demonstrating the potential for coverage under the terms of the policy. (Aydin Corp. v. First State Ins. Co. (1998) 18 Cal.4th 1183, 1188 [77 Cal.Rptr.2d 537, 959 P.2d 1213].) Relying on Central Nat. Ins. Co. v. Superior Court (1992) 2 Cal.App.4th 926, 932 [3 Cal.Rptr.2d 622], both defendant and respondent, the Underwriters of Lloyds of London, and the majority state that on a motion for summary judgment the burden rests with the nonmoving plaintiff (insured) to prove that “ ‘ “an event is a claim within the scope of the basic coverage.” ’ ” (Maj. opn., ante, at p. 1185.) I disagree; this statement runs counter to basic summary judgment law. Within the context of a summary judgment motion wherein the insurer is moving for summary judgment on the basis that there is no coverage, I believe the burden rests with the moving party (insurer) to demonstrate that there is no potential for coverage. (Powerine Oil Co., Inc. v. Superior Court, supra, 37 Cal.4th at p. 390.)

 It is speculative to assess what the insurer believed the insured understood as to the scope of the coverage in that the present record does not contain any extrinsic evidence relevant thereto.

 In looking at the mutual intention of the parties, I do not think the parties intended not to have covered adulteration during production.