Filed 3/8/17; part. pub. & mod. order 4/6/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MITCHELL J. STEIN, | B265069 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC549522) |
| v. | |
| AXIS INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael M. Johnson, Judge. Affirmed in part and reversed in part.

Law Offices of James N. Fiedler and James N. Fiedler for Plaintiff and Appellant.

Bowman and Brooke, Julian G. Senior and Marion V. Mauch; BatesCarey, Ommid C. Farashahi, Michael T. Skoglund and Tiffany Saltzman-Jones for Defendants and Respondents AXIS Insurance Company and AXIS Capital Holdings Limited.

Drinker Biddle & Reath, William A. Hanssen; Shipman & Goodwin and Joseph A. Bailey III for Defendants and Respondents HCC Global Financial Products, LLC, HCC Insurance Holdings, Inc., and Houston Casualty Company.

_____

In 2007, Heart Tronics, Inc., a medical device company, purchased directors and officers liability insurance policies from AXIS Insurance Company (AXIS) and Houston Casualty Company (HCC). The AXIS policy has been exhausted.

Under the HCC policy, HCC agreed to pay defense expenses incurred by Heart Tronics's officers and directors, and individuals serving in functionally equivalent capacities, in any criminal or civil proceedings, including appeals. An exclusion provided that upon final determination that an insured person committed willful misconduct, the insured would be obligated to repay the insurer any defense expenses paid on his or her behalf.

Mitchell J. Stein served Heart Tronics as a de facto officer, managing the company full-time without pay or formal position or title. In 2013, Stein was convicted of securities fraud in federal court. He tendered his appeal of that conviction to HCC, but HCC denied coverage, in part because it considered the conviction to be a "final determination" of Stein's willful misconduct for purposes of the policy exclusion, notwithstanding the policy's express coverage of defense expenses on appeal. Stein's conviction was affirmed on appeal, but a motion for rehearing is currently pending.

Stein sued HCC, alleging it defrauded him and breached the 2007 policy by failing to pay his litigation expenses on appeal. Stein also sued AXIS, alleging it conspired with HCC to defraud

him.  The superior court sustained the insurers' demurrers without leave to amend on several grounds and dismissed the case.

We conclude the AXIS demurrer was properly sustained because AXIS was a stranger to the HCC policy and owed no duties connected with it.  The HCC demurrer was improperly sustained because when a policy expressly provides coverage for litigation expenses on appeal, an exclusion requiring repayment to the insurer upon a "final determination" of the insured's culpability applies only after the insured's direct appeals have been exhausted.  Therefore, we reverse the trial court's judgment in part and affirm it in part.

## BACKGROUND

We take the facts from the operative first amended complaint and from matters properly subject to judicial notice.

Heart Tronics, Inc., formerly Signalife Inc. (we will refer to them interchangeably), developed and manufactured an electrocardiograph monitor called the Fidelity 100.  Stein was a founder of Heart Tronics, and by 2007 functioned as its outside general counsel and also what he calls its "chief creative architect," managing the company on a full-time, daily basis without pay, formal position or title.

In November 2007, Stein and Lowell Harmison, CEO of Heart Tronics, purchased a $5 million directors and officers (D&O) liability insurance policy from HCC.

### 1.    Original HCC Policy Draft

As originally offered, the HCC policy provided that HCC agreed to "pay, on behalf of the Insured Persons, Loss from

3

Claims first made during the Policy Period," November 13, 2007, to November 13, 2008.[1]

     a.     Original Definitions

     "Loss" was defined as "any amount, including Defense Expenses, which an Insured Person is obligated to pay as a result of a Claim . . . ."

     "Defense expenses" included "reasonable legal fees . . . incurred . . . in defense of a Claim."

     "Insured person" meant "any past, present or future director or officer of" Signalife.

     "Claim" meant "written notice received by an Insured Person or the Company that any person or entity intends to hold an Insured Person responsible for a Wrongful Act, including . . . a legal, injunctive or administrative proceeding . . . ."

     "Wrongful act" meant "any actual or alleged act . . . or breach of duty by an Insured Person in his or her capacity as" a "director or officer" of Signalife.

     b.     Original Exclusions III(A)(3) and (III)(B)

     HCC Policy Exclusion III(A)(3) (the Willful Misconduct Exclusion) excluded payment for loss in connection with any claim arising from "any dishonest or fraudulent . . . or . . . criminal act . . . or any willful violation of any statute . . . by an Insured Person," but did not exclude payment for defense expenses, provided that a final determination that the insured person committed the wrongful act would obligate him or her to repay the defense expenses.

---

     [1] We omit bold typeface from all policy excerpts.

4

Exclusion III(B) (the Bodily Injury Exclusion) excluded payment for defense expenses altogether if the claim involved bodily injury.[2]

## 2. Amended HCC Policy

Stein and Harmison were dissatisfied with the offered HCC policy because it failed to cover criminal matters or individuals such as Stein, who had no formal title but was extensively involved in Signalife operations. On December 18, 2007, they met with HCC agents Paul Chambers and Lindsay McLeroy, who offered an amended policy that extended coverage to defense costs for criminal matters—from the initial filing of charges to final appeal—and to any individual serving Signalife as the "functional equivalent" of an officer or director. Chambers and McLeroy represented to Stein and Harmison that the amended policy "absolutely" covered Stein as a de facto officer of Signalife.

### a. Amended Definitions

In the amended policy, the definition of "claim" was expanded to include any civil or criminal proceeding "commenced by the service of a complaint or similar document, the filing of a notice of charges or formal investigative order, or the return of an indictment or information, including an appeal from any such proceeding."

"Wrongful act" was redefined to include an act committed not only by an insured person in his or her capacity as a director

---

[2] Exclusion III(B) provided, in pertinent part, the following: "The Insurer will not pay Loss, including Defense Expenses, in connection with any Claim . . . for bodily injury, sickness, disease or death of any person, or for damage to or destruction of any tangible property . . . ."

or officer of Signalife, but also an insured person acting in his or her capacity as the "functional equivalent" of an officer or director. As redefined, "wrongful act" meant "any actual or alleged act . . . or breach of duty by an Insured Person," and "insured person" was expanded to include not only officers and directors, but any person "serving . . . in a position functionally equivalent" to an officer or director.

      b.     Amended Exclusion III(A)(3)

The Willful Misconduct Exclusion was amended to provide, in pertinent part, that "Except for Defense Expenses, the Insurer shall not pay Loss in connection with any Claim" occasioned by willful misconduct. The exclusion would be invoked "only if there has been . . . a final adjudication adverse to [the] Insured Person in the underlying action . . . establishing that the Insured Person" committed willful misconduct. "If it is finally determined that [the exclusion] applies," the insured would be obligated to repay the insurer any defense expenses paid on his or her behalf.[3]

---

[3] Section III(A)(3) provides: "Except for Defense Expenses, the Insurer shall not pay Loss in connection with any Claim: [¶] . . . [¶]

"(3)    brought about or contributed to by any dishonest or fraudulent act or omission or any deliberately criminal act or omission or any willful violation of any statute, rule or law by an Insured Person, or by an Insured Person gaining any personal profit, remuneration or advantage to which he or she was not legally entitled; provided, that:

      "(a)    This Section III. Exclusion (A)(3) shall apply only if there has been:

6

### 3. Criminal Proceedings

On December 13, 2011, a federal grand jury indicted Stein on 14 counts of mail, wire, and securities fraud; money laundering; and obstruction of justice.  The grand jury charged that Stein, whose wife nominally owned a limited liability company that owned 85 percent of Signalife, misappropriated

---

"(i)    a final adjudication adverse to such Insured Person in the underlying action or proceeding or in any separate action or proceeding, or

"(ii)    a written admission by such Insured Person,

"establishing that the Insured Person so acted or gained such a profit, remuneration or advantage;

"(b)    For purposes of determining the applicability of this exclusion, no Wrongful Act of any Insured Person shall be imputed to any other Insured Person, and the existence of allegations in a Claim which, if proven, would be subject to this section III[] Exclusion (A)(3) shall not affect the right of the Insured Person to the current payment of Defense Expenses; and

"(c)    If it is finally determined that this section III[] Exclusion (A)(3) applies to any Claim against an Insured Person, such Insured Person will repay the Insurer any Defense Expenses paid on his or her behalf in connection with such Claim."

7

Signalife's assets, testified falsely to the United States Securities and Exchange Commission (SEC) to conceal his conduct, and engaged in a "pump and dump" scheme wherein he artificially inflated the company's stock and concealed his ownership and trading of the shares. On May 20, 2013, a jury found Stein guilty on all counts, and he was sentenced to 17 years in prison and ordered to forfeit over $5 million. Stein appealed the judgment, and in January 2017 the Eleventh Circuit affirmed his conviction but vacated the sentence and remanded the matter for resentencing. (*United States v. Stein* (11th Cir. Fla. Jan. 18, 2017) 2017 U.S. App. LEXIS 813, *43.) On February 7, 2017, Stein moved for panel or en banc rehearing before the Eleventh Circuit.

### 4. SEC Action

On December 20, 2011, the SEC filed a civil action against Stein and Heart Tronics, alleging securities fraud and falsification of records. The SEC alleged Stein "was a de facto officer" of Heart Tronics, "in that he performed policy-making functions for Heart Tronics akin to an officer." On February 18, 2015, the district court granted summary judgment to the SEC, finding no triable issue existed as to Stein's securities fraud, and ordered Stein to disgorge $5,378,581.61 in illegally-gained profits.

### 5. Tender to HCC

After his criminal conviction, Stein tendered his appeal to HCC. HCC denied coverage on the ground that Stein was not the "functional equivalent" of a Heart Tronics officer.

### 6. Complaint and HCC Demurrer

On June 25, 2014, Stein and Heart Tronics sued HCC Insurance Holdings, Inc., and in the first amended complaint named as additional defendants HCC, HCC Insurance Holdings

8

Group, and HCC Global Financial Products, LLC.[4]  Plaintiffs asserted in the first amended complaint causes of action for fraud, breach of contract, breach of the covenant of good faith and fair dealing, and unfair competition, alleging Stein was the functional equivalent of a Signalife officer or director, and HCC breached the HCC policy by refusing to pay his defense expenses in the SEC and criminal matters.  Plaintiffs alleged Chambers and McLeroy were given express authority by HCC to represent it in negotiations, and they represented to Stein and Harmison that Stein was "absolutely" covered under the HCC policy, knowing at the time that the representation was false.  Plaintiffs sought damages and an injunction enjoining defendants from making any payment under the HCC policy until they first paid Heart Tronics and Stein.

---

[4] HCC Insurance Holdings Group has never appeared in this action and appears not to exist.  Plaintiffs alleged the remaining three HCC defendants "are alter egos of one another such that it would work an injustice to give them any legal *indica* [*sic*] of separateness, because any separateness among them has ceased to exist.  These entities mix and replace one at the whim of the other for virtually all business purposes such as sending legal notices and conducting financial and business transactions."  HCC Global Financial Products and HCC Insurance Holdings, Inc. demurred on the ground that they cannot be held liable for breach of a contract to which they were not parties.  The trial court sustained the demurrer, concluding plaintiffs' alter ego allegations were conclusory and insufficient.  On appeal, plaintiffs do not ascribe error to this ground for the court's ruling.  Therefore, we conclude the demurrer was properly sustained as to HCC Global Financial Products and HCC Insurance Holdings, Inc.

HCC, HCC Global Financial Products, and HCC Insurance Holdings, Inc. demurred to the first amended complaint, contending Stein was not an insured person under the HCC policy and his defense expenses incurred in the SEC and criminal proceedings did not constitute losses under the policy.

The HCC defendants argued that under the sham pleading doctrine, Stein was estopped from asserting that he was a de facto officer of Heart Tronics because he repeatedly took contrary factual positions in prior proceedings. In support of the argument, defendants sought judicial notice of several prior proceedings that purported to show Stein (1) denied in the SEC action that he was a de facto officer of Heart Tronics; (2) represented to the district court in the criminal proceeding that he ceased serving as the company's chief creative architect before 2005; (3) represented in proceedings in 2006 that he had never held any official position with Heart Tronics; and (4) represented in other proceedings that he was not a Heart Tronics officer or director and did not control the company. Even if Stein was the functional equivalent of a Heart Tronics officer, the HCC policy did not cover his defense expenses in the SEC and criminal proceedings because in those proceedings he was accused of misconduct unrelated to any service to the company. Instead, he was accused of fraud and obstruction of justice committed in his personal capacity as a witness, lawyer, or husband of the majority owner. In any event, defendants argued, HCC Insurance Holdings Group was not a proper defendant because no such entity existed, and HCC Global Financial Products and HCC Insurance Holdings, Inc. were improper defendants because they were not parties to the HCC policy.

Defendants further demurred to plaintiffs' cause of action for fraud on the ground that the action was barred by the applicable limitations period, the first amended complaint failed to allege facts supporting fraudulent intent, and the complaint failed to allege facts showing Chambers and McLeroy were HCC's agents.

In opposition to the HCC demurrer, plaintiffs argued Stein was covered under the HCC policy because the SEC complaint specifically alleged he was a de facto officer of Heart Tronics. Plaintiffs argued all factual allegations sufficed to state causes of action, and the fraud action was not time-barred because plaintiffs did not discover HCC's fraud until it denied coverage.

The trial court sustained the demurrer without leave to amend on the grounds that (1) the sham pleading doctrine precluded Stein from alleging he was a de facto officer of Heart Tronics because in other litigation he asserted the opposite; (2) coverage was precluded under the Willful Misconduct Exclusion because Stein's criminal conviction was "final under federal law until it is reversed"; (3) HCC Global Financial Products and HCC Insurance Holdings, Inc. were not parties to the HCC policy; (4) plaintiffs could not state a cause of action for fraud because they alleged only that HCC failed to perform a promise, not that its representations concerning coverage were false at the time they were made; and (5) plaintiffs' cause of action for fraud was barred by the applicable limitations period because they should have discovered HCC's alleged fraud in 2007, when the HCC policy was delivered. This ruling was made before Stein's conviction was affirmed on appeal.

11

## 7. AXIS Insurance Company and AXIS Capital Holdings Limited

AXIS Insurance Company also issued a D&O policy to Signalife, but it paid out the limits of that policy in defense of other civil actions, and the policy is not at issue in this litigation. Plaintiffs nevertheless named AXIS and AXIS Capital Holdings Limited as defendants in this litigation ostensibly because of their role in a conspiracy with HCC to defraud Signalife.

Plaintiffs allege the AXIS defendants conspired with HCC and "unindicted co-conspirators" "to attempt to fatally injure" Signalife by:

1. "conditioning payment for legal fees on taking legal positions approved by the insurers";

2. denying coverage under the HCC and AXIS policies;

3. frustrating plaintiffs' pursuit of coverage;

4. misappropriating or destroying Signalife records;

5. aiding other coconspirators to commit litigation misconduct, including perjury;

6. "encouraging and then supporting" the formation of a Signalife competitor using stolen Signalife trade secrets;

7. along with HCC, negotiating the HCC policy with Signalife;

8. representing to Signalife, through Chambers and McLeroy (who were AXIS agents as well as HCC agents), that the HCC policy covered Stein;

9. inducing Signalife to enter into both the AXIS and HCC policies and, reassured by them, to embark on expansive business plans, including taking on a $100 million line of credit and drawing down on it, embarking on a "Marquee Hospital Initiative," and embarking on an "International Initiative";

10. "violat[ing] the law manipulat[ing] coverage decisions";

11. "attempt[ing] to control the way [Signalife] asserted its legal rights by forcing the Company to hire its (AXIS Defendants') chosen counsel";

12. "treat[ing] counsel for the Company different from counsel for others who were involved in the conspiracy";

13. failing to pay "hundreds of thousands of dollars of legal fees for the same kind of work AXIS Defendants paid the lawyers who were representing the coconspirators";

14. misappropriating and hiding the HCC policy;

15. conspiring with HCC to deny Stein coverage under the HCC policy;

16. joining in the HCC fraud to induce plaintiffs to purchase the AXIS policy;

17. failing to honor its D&O policy by "refusing—in bad faith—to cover (or provide a defense) with respect to various claims and parties under the" policy;

18. failing to investigate; and

19. delaying resolution of claims.

Plaintiffs alleged the AXIS defendants' actions caused Signalife to lose its records and trade secrets, "forfeit its legal rights," and "give up its FDA-approved, award-winning technologies."

The AXIS defendants demurred to the first amended complaint on the grounds that plaintiffs failed to allege how the AXIS defendants could be liable for misrepresentations and misconduct in connection with the HCC policy. The trial court sustained the AXIS defendants' demurrer without leave to amend on this ground.

13

**8.    Appeal**

Stein (but not Heart Tronics) appealed from the resulting judgment.

## DISCUSSION

## I.    Standard of Review

When a demurrer is sustained, we review the complaint de novo to determine whether it alleges facts stating a cause of action under any legal theory.  (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.)  We accept as true all properly pleaded material facts, but not contentions, deductions, or conclusions.  (*Id*. at pp. 42-43.)  "[W]hen [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  A plaintiff has the burden to show what facts could be pleaded to cure defects in the complaint.  (*Total Call Internat., Inc. v. Peerless Ins. Co.* (2010) 181 Cal.App.4th 161, 166.)  To meet this burden on appeal, the plaintiff must enumerate the facts and demonstrate how they establish a cause of action.  (*Ibid*.)  "On appeal from a judgment of dismissal entered after a demurrer has been sustained without leave to amend, unless failure to grant leave to amend was an abuse of discretion, the appellate court must affirm the judgment if it is correct on any theory."  (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742.)

## II.    HCC Defendants' Demurrer

### A.    Breach of the HCC Policy—Willful Misconduct Exclusion

Apparently relying on an exclusion in the HCC policy requiring an insured to repay defense expenses if it has been "finally determined" the insured committed willful misconduct,

14

the trial court sustained HCC's demurrer to plaintiffs' cause of action for breach of contract on the ground that Stein's expenses on appeal were not covered under the policy because his criminal conviction was "final . . . until it is reversed." The court erred.

" ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' [Citation.] [¶] ' "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does "[d]isagreement concerning the meaning of a phrase," or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " [Citation.] " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " [Citation.] "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." [Citation.]' " (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390-391.)

The HCC policy provided coverage for "loss," which the policy defined as "any amount," including defense expenses, the

insured would be obligated to pay as the result of a claim. "Claim" included any civil or criminal proceeding, and expressly included "an appeal from any such proceeding." Although the Willful Misconduct Exclusion removed coverage for losses brought about by fraud or criminal acts, the exclusion did not apply to defense expenses: "*Except for Defense Expenses*, the Insurer shall not pay Loss in connection with any Claim [brought about by fraud]." (Italics added.) The policy language therefore clearly and explicitly obligated HCC to cover an insured's defense expenses incurred as a result of an appeal from a civil or criminal proceeding even if a trial court determined the insured was guilty of or liable for fraud.

This coverage is further supported by the fact that when the parties wished to exclude defense expenses from coverage, they did so explicitly. Exclusion III(B) excludes payment for defense expenses if a claim involves bodily injury, as follows: "The Insurer will not pay Loss, including Defense Expenses, in connection with any Claim . . . for bodily injury, sickness, disease or death of any person, or for damage to or destruction of any tangible property . . . ." That Exclusion (III)(*A*) did not explicitly exclude defense expenses on appeal implies the parties did not wish it to do so.

HCC argues the Willful Misconduct Exclusion, which becomes operative once there has been a "final adjudication" of fraud, precludes coverage here because a federal trial court judgment such as Stein's criminal conviction is a final adjudication for policy purposes. This is so, HCC argues, because under federal law, a trial court judgment is deemed to be a final adjudication until reversed on appeal. The argument suffers many fatal flaws.

16

First, nothing in the policy indicates the parties intended that the phrase "final adjudication" carry the same meaning in the exclusion as it carries in federal law. Policy language is construed in the context of the policy as a whole and the circumstances of the case, not by reference to abstract concepts cherry picked from outside factors. (*Powerine Oil Co. v. Superior Court*, *supra*, 37 Cal.4th at p. 391.) The policy made no mention of federal law and no distinction between federal and state court proceedings. That Stein's conviction happened to be in federal court was irrelevant to the policy.

Second, a thing that is "final until reversed" is not final. (See *Martin v. Martin* (1970) 2 Cal.3d 752, 761 [under federal law, a trial court judgment is final for purposes of res judicata but may still be appealed].) An appellate court can render an adjudication as well as a trial court can, with the added benefit greater finality.

Third, even if HCC were correct that the Willful Misconduct Exclusion comes into play when a final adjudication determines culpability, the point is irrelevant because the exclusion by its terms does not apply to defense expenses.

HCC represents that "[c]ourts have repeatedly held that the exhaustion of all appeals is unnecessary to satisfy exclusions that require a 'final adjudication.'" It is incorrect. HCC cites two trial court cases for this "repeated" holding, *Unencumbered Assets v. Great Am. Ins. Co.* (S.D. Ohio 2011) 817 F.Supp.2d 1014 (*Unencumbered Assets*) and *Chubb Custom Ins. Co. v. Triumph Capital Group, Inc.* (Mass. Super. Ct. 2007) 22 Mass.L.Rep. 192 (*Triumph*), but each undermines rather than supports its point. In each case, the policy at issue provided that a "*judgment or other* final adjudication" would trigger a dishonesty exclusion.

17

(*Unencumbered Assets, supra*, at p. 1033, italics added; *Triumph*, *supra*, at p. *6, italics added.) Each court treated this phrase as disjunctive, and held that the occurrence of either disjunct—for example, a judgment—would alone suffice to trigger the dishonesty exclusion. (*Unencumbered Assets, supra*, at p. 1032; *Triumph, supra*, at pp. *8-*9 ["the phrase 'judgment or other final adjudication' is disjunctive, so a judgment of conviction would still be sufficient by itself to bar coverage even if it were not a final adjudication"].) The HCC policy is not disjunctive—there is only one trigger for the Willful Misconduct Exclusion: final adjudication. If anything, this implies a judgment alone would not trigger the exclusion.

We conclude the HCC policy covers an insured's litigation expenses incurred in directly appealing a conviction. (See *Mid-Century Ins. Co. v. Superior Court* (2006) 138 Cal.App.4th 769, 775 [an action is deemed to be pending until its final determination upon direct appeal].) Plaintiffs alleged HCC breached the policy by denying coverage for these expenses. Therefore, HCC's demurrer on the ground that Stein's criminal conviction precluded coverage should have been overruled.

### B. Breach of the HCC Policy—The Sham Pleading Doctrine

The trial court sustained HCC's demurrer to plaintiffs' cause of action for breach of the HCC policy on the ground that the sham pleading doctrine precluded plaintiffs from alleging Stein was a de facto officer of Heart Tronics. We conclude the sham pleading doctrine does not negate that allegation.

Judicial notice may be taken of the records of any court in this or any other state. (Evid. Code, § 452, subd. (d); Code Civ. Proc., § 430.70.) Although judicial notice may not be taken of the

18

truth of facts alleged in judicial records, the court may judicially notice that the facts were indeed alleged. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 877 (*Cantu*) ["Both trial and appellate courts may properly take judicial notice of a party's earlier pleadings and positions as well as established facts from both the same case *and other cases*"].) It is "well settled that a complaint otherwise good on its face is nevertheless subject to demurrer when facts judicially noticed render it defective." (*Watson v. Los Altos School Dist.* (1957) 149 Cal.App.2d 768, 771.)

Where an amended complaint omits facts alleged in a prior complaint or pleads facts inconsistent with those previously alleged, and fails to explain the omission or inconsistency, the court will read such omitted or inconsistent facts into the current complaint. (*Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946; *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 383-384.) The rule applies not only to a pleading filed in the same action, but also to a complaint in a prior action involving the same parties and based on the same underlying facts. (E.g., *Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 341 [plaintiff's allegations contradicted those he made in an earlier action involving the same parties and dispute]; *Henry v. Clifford* (1995) 32 Cal.App.4th 315, 322-323 [same].) The rule also applies to an answer filed in a prior action between the same parties on the same underlying facts and to a complaint in a prior action involving the same plaintiff but a different defendant. (E.g., *Cantu, supra,* 4 Cal.App.4th at p. 878 [plaintiff's allegations contradicted those he made in an earlier answer in litigation involving the same parties and dispute]; *State of California ex rel.*

19

*Metz v. CCC Information Services, Inc*. (2007) 149 Cal.App.4th 402, 412.)

Here, plaintiffs alleged no facts in the amended complaint that were inconsistent with those alleged in the original complaint.  Instead, defendants argue, and the trial court found, that plaintiffs made allegations in other proceedings that contradicted the allegation here that Stein served Heart Tronics as the functional equivalent of an officer or director.

HCC argues Stein represented in the criminal proceedings that he was briefly the chief creative architect for Heart Tronics before 2004, but after February 2004 served only as its outside counsel in "emergency situations."  To support the argument, HCC cites a motion to dismiss that Stein filed in the criminal proceedings in 2013, in which he stated, "Prior to the completion of the development of all of Signalife's heart technology, . . . Stein—for brief periods of time—acted as Chief Creative Architect for the Company.  Otherwise, including after FDA approval of the . . . 'Fidelity 100' obtained around February 1, 2004, Mr. Stein was outside counsel for the Company, and was appointed by the Company to engage as counsel specifically in emergency situations."

This statement does not preclude Stein from alleging he served as the functional equivalent of a Heart Tronics officer or director from 2007 to 2008.  First, the statement was not set forth in a prior pleading or any judicially noticeable evidence, but in a memorandum of points and authorities supporting a motion to dismiss the criminal proceedings.  No authority precludes a party from arguing an inconsistent position in a subsequent lawsuit if the party was unsuccessful in asserting the first position.  (Cf. *Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 131 [judicial estoppel

20

applies only if the first position was successful].) Second, the statement does not unequivocally contradict the current allegation. Stein stated he was Signalife's chief creative architect "[p]rior to the completion of the development of all of Signalife's heart technology." No judicially noticeable fact establishes when Signalife completed development of all of its heart technology. Further, the word "otherwise," which precedes the description of Stein's role as outside counsel, appears to introduce an additional responsibility, not a successor one.

HCC argues that in 2006 Stein declared, in a civil action in which he was a defendant, that he was not and never had been a director, officer or employee of Heart Tronics. HCC also references statements made by a trial court in another civil proceeding in 2005, and statements made by Signalife in the SEC proceedings, to the effect that Stein was not an employee, officer or director of Signalife. All of these statements are irrelevant because they do not contradict the allegation that Stein served as the functional equivalent of an officer or director, much less that he did so during the HCC policy period from 2007 to 2008.

The trial court therefore erred in sustaining HCC's demurrer on the ground that the sham pleading doctrine precluded plaintiffs from alleging Stein served as the functional equivalent of a Heart Tronics officer or director.

C.    **HCC's Alleged Fraud—Specificity of Pleading**

The trial court sustained HCC's demurrer to plaintiffs' cause of action for fraud on the ground that they failed to allege that HCC's representations concerning coverage were false at the time they were made, instead alleging only that HCC failed to perform a promise.

21

" 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.] [¶] 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.] [¶] An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

As noted above, plaintiffs alleged that in order to induce them to enter into the HCC policy agreement, HCC's representatives represented that Stein would be covered under the HCC policy, knowing the representation to be false. Plaintiffs alleged they justifiably relied on HCC's representation, to their detriment. Plaintiffs' allegations, if true, would establish all the elements of promissory fraud.

HCC argues a plaintiff cannot plead fraudulent intent simply by alleging the defendant made but failed to keep a promise. We agree, but here, plaintiffs alleged further that HCC never intended to keep its promise, which constitutes fraudulent intent. (*Crouch v. Wilson* (1920) 183 Cal. 576, 579 [allegation that a representation was "personally known by the [speaker] to be untrue" suffices].) HCC argues that "California law requires Stein to have evidentiary support for his unqualified allegation[s]," but he failed to plead "any evidence of contemporaneous fraudulent intent." But in California, a

22

plaintiff need allege only the existence of facts, not evidence. "Because knowledge is a fact, it is sufficiently pleaded by the general averment that the defendant knew the representation was false . . . . How the defendant acquired that knowledge, what his or her sources were, would be evidentiary and unnecessary." (5 Witkin (5th ed. 2008) Cal. Procedure, Pleadings, § 726.)

HCC argues plaintiffs cannot allege justifiable reliance on its misrepresentation because the HCC policy, in connection with Stein's sham pleadings, prevented plaintiffs from considering Stein to be a covered person under the policy. This argument fails because, as discussed above, the policy potentially covered individuals such as Stein.

HCC argues plaintiffs failed to allege with sufficient specificity that Chambers and McLeroy acted with HCC's express authorization, characterizing plaintiffs' allegations as "similar" to those found deficient in *Moore v. Regents of Univ. of Cal.* (1990) 51 Cal.3d 130 and *Penny v. NDeX West LLC* (C.D.Cal. Feb. 22, 2012) 2012 U.S. Dist. LEXIS 22070. The trial court overruled HCC's demurrer on this ground, and we agree, finding no similarity between the allegations found deficient in the cases HCC cites and those made here. In *Moore v. Regents of Univ. of Cal.*, the plaintiff alleged only that " 'each of the [five] defendants was the agent, joint venturer and employee of each of the other remaining defendants.' " (*Moore v. Regents of Univ. of Cal.*, *supra*, 51 Cal.3d at p. 134, fn. 12.) In *Penny v. NDeX West*, the plaintiff "fail[ed] to allege that any of the people she spoke with had any authority to act on [a corporate defendant's] behalf." (*Penny v. NDeX West*, *supra*, 2012 U.S. Dist. LEXIS at p. *22.) Here, plaintiffs alleged "Mr. Chambers and Ms. McLeroy were authorized by the Insurance Defendants to negotiate the policies

23

on their behalf and the Insurance Defendants authorized and intended Mr. Chambers and Ms. McLeroy to bind the Insurance Defendants at the time of the December 18, 2007 negotiations." Plaintiffs thus alleged that defendants expressly authorized two specifically identified individuals to represent them.  This sufficed.

### D. HCC's Alleged Fraud—Limitations Period

The trial court sustained HCC's demurrer to plaintiffs' cause of action for fraud on the additional ground that the action was barred by the applicable limitations period because plaintiffs should have discovered HCC's alleged fraud in 2007, when the HCC policy was delivered.  We disagree.

The limitations period for fraud is three years.  (Code Civ. Proc., § 338, subd. (d).)  "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.]  An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806-807.)  "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.]  Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." (*Id.* at p. 807.)  "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action." (*Ibid.*)  The discovery rule applies to causes of action for fraud or mistake.  (*Sun 'N Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 701 ["In a long line

24

of cases we have held that a cause of action for fraud or mistake accrues, and the limitations period commences to run, when the aggrieved party could have discovered the fraud or mistake through the exercise of reasonable diligence"].)

"In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' [Citation.] In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand demurrer.' " (*Fox v. Ethicon Endo-Surgery*, *supra*, 35 Cal.4th at p. 808.)

Here, plaintiffs alleged they discovered HCC's fraud in early 2014, when the insurer denied coverage on the ground that Stein, although arguably a de facto officer of Signalife, did not serve in a position functionally equivalent to an officer. Plaintiffs filed the instant complaint in June 2014, less than three years later.

HCC argues the HCC policy itself put plaintiffs on notice that Stein was not an insured person in 2007, long before plaintiffs filed the instant complaint. The argument fails for reasons discussed above.

### E. Unfair Competition and Breach of Covenant

The trial court sustained HCC's demurrer to plaintiffs' cause of action for breach of the covenant of good faith and fair dealing for the same reason it sustained the demurrer to the breach of contract cause of action. The trial court sustained HCC's demurrer to plaintiffs' cause of action for unfair

25

competition for the same reason it sustained the demurrer to the breach of contract and fraud causes of action. On appeal, HCC argues the causes of action for breach of covenant and unfair competition fail "[f]or the same reasons" that the others fail. Because HCC urges no independent grounds supporting its demurrers to the causes of action for breach of covenant and unfair competition, the matter requires no further discussion. For reasons stated above, the demurrers to these causes of action should have been overruled.

## III.  AXIS Defendants' Demurrer

Plaintiffs alleged the AXIS defendants falsely induced Signalife to purchase the AXIS policy and committed several acts of misconduct that deprived plaintiffs of the benefits of the *HCC* Policy. The trial court sustained the AXIS defendants' demurrer on the ground that allegations directed only at the HCC policy failed to allege causes of action against the AXIS defendants.

Stein contends the first amended complaint adequately alleges a civil conspiracy, as it alleges AXIS authorized Chambers and McLeroy to make representations to Signalife regarding the HCC policy, and the AXIS and HCC defendants conspired to "fatally injure" the company by:  (a) "conditioning payment for legal fees on taking legal positions approved by the insurers"; (b) refusing to cover (or provide a defense) "with respect to various claims and parties under the Policies"; (c) "refusing coverage" under the policies; (d) "taking the Company's records and depriving the Company of access to those records"; (e) "aiding other co-conspirators into litigation practices that included numerous acts of misconduct including, but not limited to, fraudulent and perjurious testimony"; and (f) "encouraging and then supporting the formation of a competitor of the Company

26

using trade secrets of the Company purloined by the co-conspirators and inducing breaches by Company officers of non-competition agreements with the Company."

Plaintiffs thus purport to allege the AXIS defendants conspired to defraud them, to breach the covenant of good faith and fair dealing with respect to the HCC policy, and to commit unfair business practices. Plaintiffs also allege the AXIS defendants directly defrauded them.

### A. Conspiracy to Breach the Covenant of Good Faith and Fair Dealing

Conspiracy is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.)

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349.) AXIS, as a stranger to the HCC policy, cannot be held liable for frustrating Stein's right to receive benefits under the policy. "By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." (*Applied Equipment Corp. v. Litton Saudi Arabia, supra*, 7 Cal.4th at p. 511.) As strangers to the HCC policy, the AXIS defendants were legally incapable of conspiring to commit a tort relating to it. The trial court

27

therefore properly sustained their demurrer to the breach of covenant cause of action.

## B. Fraud

The other allegations against the AXIS defendants sound in fraud. The most pertinent appears to be that the AXIS defendants "joined in the representation of the HCC Defendants in order to induce the purchase of the AXIS Policy. Their authorized agents were, too, Mr. Chambers and Ms. McLeroy, for purposes of their business dealings with Plaintiffs."

"In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] 'Thus " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.' " [Citation.] [¶] This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' [Citation.] A plaintiff's burden in asserting a fraud claim against a corporate employer is even greater. In such a case, the plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.' " (*Lazar v. Superior Court, supra*, 12 Cal.4th at p. 645.)

Plaintiffs' claim that Chambers and McLeroy were AXIS's agents "for purposes of their business dealings with Plaintiffs" does not adequately allege the agents were authorized to negotiate the HCC policy or make representations about HCC's intentions as part of their agency, because plaintiffs fail to allege how the HCC policy was part of AXIS's "business dealings" with Signalife. Neither do plaintiffs describe how plaintiffs could

28

justifiably rely on the representation by AXIS, a stranger to the HCC policy, that HCC would honor its promises under the policy. The trial court therefore properly sustained the AXIS defendants' demurrer to the extent it challenged this instance of alleged fraud.

Plaintiffs also alleged the AXIS defendants conspired to commit other acts of fraud by conditioning payment for "legal fees" on taking "legal positions"; refusing "coverage" under "policies" with respect to "various claims and parties"; taking "company records"; aiding "co-conspirators" in "litigation practices" that included "numerous acts of misconduct" including fraudulent and "perjurious testimony"; and encouraging the formation of a "competitor" using "trade secrets" purloined by co-conspirators and inducing company officers to breach "non-competition agreements." But none of these allegations specify how AXIS committed the fraud, when, where, with whom, or by what means. The trial court therefore properly sustained the AXIS defendants' demurrer to plaintiffs' cause of action for fraud.

### C.    Unfair Business Practices

Absent a predicate unfair practice, plaintiffs' cause of action against the AXIS defendants for unfair business practices also fails.

## IV.   Leave to Amend

To be granted leave to amend, a plaintiff "must submit a proposed amended complaint or, on appeal, enumerate the facts and demonstrate how those facts establish a cause of action." (*Cantu, supra*, 4 Cal.App.4th at p. 890.) Here, plaintiffs argue they should have been given leave to amend to allege more clearly that the HCC policy "belie[s] the insurers' positions" or to "more specifically allege" conspiracy. Plaintiffs offered no

29

amended complaint below, and on appeal adduce no specific facts they could allege to cure the complaint as to the AXIS defendants. Therefore, leave to amend as to the AXIS defendants was properly denied.

## V.     Requests for Judicial Notice

HCC's request for judicial notice of the Eleventh Circuit's opinion affirming Stein's conviction but vacating his sentence and remanding for resentencing is granted. (Evid. Code, § 452, subd. (d).) Stein's request for judicial notice of his petition for rehearing before the Eleventh Circuit is also granted. (*Ibid*.) Stein's other requests for judicial notice are denied as calling for notice of irrelevant material. (See *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1141, fn. 6.)

## DISPOSITION

The judgment is affirmed as to Heart Tronics, HCC Global Financial Products, HCC Insurance Holdings, Inc., and the AXIS defendants. The judgment is reversed as to Stein's complaint against HCC. The AXIS defendants, HCC Global Financial Products, and HCC Insurance Holdings, Inc. are to recover their costs on appeal. Stein and HCC are to bear their own costs.


                                                    CHANEY, J.

We concur:


         ROTHSCHILD, P. J.


         JOHNSON, J.


30

Filed 4/6/17

# CERTIFIED FOR PARTIAL PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| MITCHELL J. STEIN, | B265069 |
| | (Los Angeles County |
| Plaintiff and Appellant, | Super. Ct. No. BC549522) |
| | ORDER MODIFYING OPINION, |
| v. | CERTIFYING OPINION FOR |
| | PARTIAL PUBLICATION |
| AXIS INSURANCE COMPANY et al., | [NO CHANGE IN JUDGMENT] |
| | |
| Defendants and Respondents. | |

THE COURT:

It is ordered that the opinion filed herein on March 8, 2017, be modified as follows:

1. The last sentence on page 11 is omitted.

2. On page 17, the second paragraph modified to read as follows:

> Second, even under federal law, an adjudication that is "final until reversed" is not final for all purposes. (See *Martin v. Martin* (1970) 2

---

Sections 1 to 6, and 8 of the Background (not section 7), sections I, II(A), IV, and V of the Discussion (not sections II(B) to II(E) or III), and the Disposition are certified for publication.

Cal.3d 752, 761 [under federal law, a trial court judgment is final for purposes of res judicata but may still be appealed].)  An appellate ruling is as much an "adjudication" as a trial court judgment, with greater finality.

3.  On page 17, fourth paragraph, the sentence "It is incorrect" is deleted.

4.  On page 17, the word "its" in the antepenultimate line is changed to "HCC's."

There is no change in the judgment.

The opinion in the above-entitled matter filed on March 8, 2017, was not certified for publication in the Official Reports. Pursuant to California Rules of Court, rule 8.1105(c), this opinion is ordered for partial publication in the Official Reports as noted in the page 1 footnote.

_____

ROTHSCHILD, P. J.          CHANEY, J.          JOHNSON, J.

2